JAMES ALDERSON, SURVIVING HUSBAND, AND ESTATE OF CLARISSA E. ALDERSON, DECEASED, JAMES ALDERSON, EXECUTOR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 88988. Filed May 7, 1962.

*Paul Frederic Marx, Esq.*, and *Ernest J. Zack, Esq.*, for the petitioners.

*Paul G. Wilson, Jr., Esq.*, for the respondent.

BRUCE, *Judge:* Respondent determined a deficiency in income tax for the taxable year 1957 in the amount of $39,530.58.

Certain adjustments made by respondent are not contested.

The sole question for our determination is whether the transactions by which petitioners disposed of their title to certain realty, located in Orange County, California, and acquired title to certain other realty, located in Salinas, California, constituted a nontaxable exchange within the provisions of section 1031, I.R.C. 1954.

FINDINGS OF FACT.

The parties have stipulated certain facts. The stipulation and the exhibits are incorporated herein by this reference.

Petitioners are James Alderson and the estate of Clarissa E. Alderson. For convenience, we shall refer to James Alderson and his deceased wife, Clarissa E. Alderson, as petitioners.

In 1957 petitioners were husband and wife and resided in Los Angeles County, California. They timely filed a joint income tax return on the cash basis for the taxable year 1957 with the district director of internal revenue in Los Angeles.

In 1951 petitioners purchased certain property consisting of 31.148 acres and located in Orange County, California, hereinafter referred to as the Buena Park property, which they farmed continuously until sometime in 1957, in which year they learned from Merrill Hunt, a real estate broker, that Alloy Die Casting Company, hereinafter referred to as Alloy, was interested in acquiring the property.

Following negotiations between representatives of petitioners and Alloy, the parties executed, in the form of escrow instructions to Orange County Title Company, hereinafter referred to as Orange, a purchase-and-sale agreement dated May 21, 1957, under which petitioners agreed to sell their Buena Park property to Alloy for a cash consideration of $5,550 per acre, the acreage later determined by survey to be 31.148 acres and the total purchase price to be $172,871.40.

Under the terms of the May 21, 1957, agreement, Alloy deposited in the Orange escrow $17,205 toward the purchase of the Buena Park property.

From the outset, petitioners desired to exchange their Buena Park property for other property of a like kind. They intended to sell the property for cash only if they were unable to locate a suitable piece of property to take in exchange. At the time the May 21, 1957,

agreement was executed, Alloy intended simply to effect a purchase of the Buena Park property for cash. Alloy did not learn that petitioners wished to create a property exchange until the latter part of July 1957.

In 1957 Orange had two separate forms, one for use in agreements for the sale of property, the other to be employed in exchanges of property. The parties utilized the former for their May 21, 1957, agreement.

Following execution of the May 21, 1957, escrow agreement, petitioners located certain property consisting of 115.32 acres in Monterey County, California, hereinafter referred to as the Salinas property, which they desired to obtain in exchange for the Buena Park property. On August 19, 1957, petitioners and Alloy executed an amendment to their May 21, 1957, escrow instructions. This amendment provided that the Salinas property would be acquired by Alloy and exchanged for the Buena Park property in lieu of the originally contemplated cash transaction. The amendment provided, however, that if this exchange were not effected by September 11, 1957, the original agreement with respect to a purchase for cash would be carried out.

On August 19, 1957, petitioners' daughter, Jean Marie Howard, acting for petitioners, executed escrow instructions to the Salinas Title Guarantee Company in the form of "Buyer's Instructions." These instructions recited that $190,000 would be paid for the Salinas property; that $19,000 was paid therewith out of a deposit by petitioners with Orange; and that title was to be taken from the then owners of the Salinas property by Salinas Title Guarantee Company. The escrow instructions contained the following additional language:

I hereby irrevocably authorize your Company to issue and deliver your deed for said premises to ALLOY DIE CASTING CO., a corporation, to be recorded immediately following the recordation of the above mentioned deed to your Company, provided you can then immediately record a deed from Alloy Die Casting Co. without warranty, express or implied, to James Alderson and Clarissa E. Alderson, his wife, issuing final title evidence in the last mentioned grantees.

Salinas Title Guarantee Company received these escrow instructions on August 20, 1957, and on that same date petitioners' daughter authorized Orange to pay $19,000 into the Salinas escrow. She authorized Orange to make a further payment of $171,000 into the Salinas escrow when such funds became available. On August 21, 1957, Orange made payment of $19,000 by check to Salinas Title Guarantee Company.

On August 22, 1957, a letter from Alloy to petitioners was executed by Alloy and petitioners, reflecting the understandings and agreements of those parties with respect to the practical means of accomplishing the exchange of properties between Alloy and petitioners.

This letter provided that Alloy's representative would deposit $172,-871.40 with the Salinas Title Guarantee Company after assurance that all other aspects of the transaction would be carried out. This amount exactly equaled the price which Alloy had agreed to pay petitioners for the Buena Park property.

Salinas Title Guarantee Company acquired title to the Salinas property for a purchase price of $190,000, the funds, in fact, being provided as noted above, that is, $19,000 deposited by petitioners' daughter and $172,871.40 being paid into the Salinas escrow by Alloy. The excess of the amounts deposited in the Salinas escrow by Alloy and petitioners' daughter over the $190,000 purchase price was paid to petitioners by Salinas Title Guarantee Company.

Title to the Salinas property was then transferred to Alloy, and on or about September 4, 1957, title to the Salinas property was transferred by grant deed from Alloy to petitioners. At the same time petitioners transferred title to the Buena Park property to Alloy.

Except for the $17,205 deposit which Alloy had paid into the Orange escrow under the original purchase agreement, Alloy paid no amounts directly into the Orange escrow. This original deposit was returned to Alloy by Orange sometime subsequent to August 28, 1957.

Alloy did not provide any part of the $19,000 which petitioners deposited in the Orange escrow and which was transferred to the Salinas escrow upon the instructions of petitioners' daughter on August 20, 1957. At no time did Alloy pay into either the Orange or the Salinas escrow any amounts which would total $190,000.

Petitioners paid approximately $10,000 into the Orange escrow for real estate commissions and escrow charges. Alloy paid $106.38 into the same escrow to cover escrow charges.

Petitioners paid for all documentary stamps connected with the transfer of title to the Buena Park property.

In the Salinas escrow the documentary stamps were paid for twice in connection with the transfer of title to the Salinas property—once by the original sellers of the Salinas property upon transfer to Salinas Title Guarantee Company and again by petitioners upon the transfer to Alloy. Alloy paid for no documentary stamps in connection with the transfer of this property.

Petitioners paid into the Salinas escrow a total of $471.80 in fees and escrow charges for the transfer of the Salinas property. Alloy paid no fees or charges in connection with this escrow.

In conformance with the demand of Alloy's legal representative during the negotiations, the deed to the Salinas property from Alloy to petitioners contained no warranty, express or implied.

Prior to signing the original escrow instructions on May 21, 1957, there had been no personal contact between petitioners and representatives of Alloy.

The deposit by Alloy of $172,871.40 in the Salinas escrow was made by Elliott Pentz, an attorney, pursuant to the commitment of his client, Alloy. The funds were received from Alloy by Pentz, were the property of Alloy, and were deposited by him in Alloy's behalf.

Alloy acquired title to the Salinas property solely to enable it to perform its agreement to exchange that property for the Buena Park property.

The Buena Park property was held by petitioners for productive use in a trade or business and was not stock in trade or other property held primarily for sale. The Salinas property was acquired by petitioners to be held for productive use in a trade or business or for investment. The Buena Park property and the Salinas property were of like kind.

## OPINION.

Petitioners owned 31.148 acres of farm property in Orange County, California, called the Buena Park property. They contend that this property was exchanged for property of a like kind in a nontaxable transaction within the purview of section 1031(a), I.R.C. 1954.[1] It is respondent's position that the transactions through which petitioners disposed of their title in the Buena Park property and acquired title to 115.32 acres of land in Salinas, California, did not constitute a nontaxable exchange of properties within the meaning of the above section.

The controversy is limited to the question whether an "exchange" within the meaning of the statute took place, since respondent concedes that the properties involved were of like kind.

The section with which we are dealing took on its present form as section 203(b)(1) of the Revenue Act of 1924. Originally, Congress enacted section 202(c) of the Revenue Act of 1921. That earlier enactment, however, provided that no gain or loss would be recognized from an exchange of property *unless* the property received in the exchange had a "readily realizable market value."[2]

Section 1031 and all of its predecessor sections require an actual change of properties. In *Jordan Marsh Company* v. *Commissioner*, 269 F. 2d 453 (C.A. 2, 1959), the court stated (p. 457): "In ordinary usage, an 'exchange' means the giving of one piece of property in return for another * * *."

---

[1] SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

[2] For a discussion of the legislative history, see *Jordan Marsh Company* v. *Commissioner*, 269 F. 2d 453 (C.A. 2, 1959), reversing a Memorandum Opinion of this Court.

While it appears from the legislative history that the intention of Congress in first enacting the predecessor section of 1031 and in subsequently reenacting similar provisions was to postpone realization of gain or loss when the taxpayer involved merely changed one piece of property for like property, it is clear that a reinvestment of the proceeds of a sale in like property does not bring the transaction within the provisions of the section. Cf. *Trenton Cotton Oil Co.* v. *Commissioner*, 147 F. 2d 33 (C.A. 6, 1945), reversing on other grounds a Memorandum Opinion of this Court.[3]

While Congress intended to provide for postponement of the realization of gain where there was merely a change in the property held, this intention was limited in its applicability to situations in which there was a true exchange of one piece of property for another.[4]

We have concluded from all the evidence before us that the transactions in which petitioners disposed of the Buena Park property and acquired the Salinas property did not constitute an exchange within the meaning of section 1031(a).

Petitioners and Alloy Die Casting Company originally entered into an escrow in May 1957, which was, in substance, an agreement for purchase and sale with respect to the Buena Park property. This escrow provided for a specific cash purchase price of $5,550 per acre or an aggregate of $172,871.40. It appears, however, that petitioners wished to acquire like property in exchange for their Buena Park property. Pursuant to this intention, they sought suitable property for acquisition, and, after entering into the original escrow with Alloy, found such property in Salinas. The parties then amended their original escrow in August 1957, providing in the amendment that Alloy would acquire title to the Salinas property and exchange it with petitioners for the Buena Park property. The amendment provided, however, that in the event the exchange contemplated did not take place by September 11, 1957, the original agreement for a sale of the Buena Park property to Alloy for cash would be carried out.

---

[3] With respect to the Revenue Act of 1924, sec. 203(b)(1), the following discussion (recorded in 65 Cong. Rec. 2799, (1924)) took place on the floor of the House of Representatives:

"MR. LAGUARDIA. Under this paragraph is it necessary to exchange the property? Suppose the property is sold and other property immediately acquired for the same business. Would that be a gain or loss, assuming there is greater value in the property acquired?

\*      \*      \*      \*      \*      \*      \*

MR. GREEN of Iowa. If the property is reduced to cash and there is a gain, of course it will be taxed.

MR. LAGUARDIA. Suppose that cash is immediately put back into the property, into the business?

MR. GREEN of Iowa. That would not make any difference."

[4] In Surrey and Warren, Federal Income Taxation 817 (1960), that intention appears to be aptly described as follows:

"In general, the justification upon which the provisions [for example, section 1031] are based is that the change produced by the exchange in the form of the investment is not sufficient in extent to break the essential continuity of the investment."

On the date the amendment to the original escrow was executed, petitioners' daughter, acting for petitioners, opened an escrow with Salinas Title Guarantee Company. She deposited with the Salinas title company $19,000 of petitioners' money and agreed, as buyer, to pay an additional amount for the Salinas property sufficient to equal a total purchase price of $190,000.

Salinas Title Guarantee Company was instructed to acquire title in its name. The escrow instructions contained, in addition, the following language:

I hereby irrevocably authorize your Company to issue and deliver your deed for said premises to ALLOY DIE CASTING CO., a corporation, to be recorded immediately following the recordation of the above mentioned deed to .your Company, provided you can then immediately record a deed from Alloy Die Casting Co. without warranty, express or implied, to James Alderson and Clarissa E. Alderson, his wife, issuing final title evidence in the last mentioned grantees.

Alloy's attorney thereafter deposited $172,871.40 in the Salinas escrow. This amount exactly equaled the price which Alloy had agreed to pay petitioners for the Buena Park property, viz, $5,550 per acre for 31.148 acres.

The provisions of this escrow were carried out, Salinas Title Guarantee Company taking title to the Salinas property in its own name and transferring title, in accordance with the buyer's instructions, to Alloy. As a part of the same transaction, Alloy then deeded the property to petitioners who, in turn, deeded title to the Buena Park property to Alloy.

We have concluded, first, that the original escrow instructions constituted merely an executory agreement. Since the contract provided several conditions precedent to transfer of title by petitioners and payment of the purchase price by Alloy, which had not been carried out at the time of the amendment, we are satisfied that a taxable sale had not then taken place. Cf. *Lucas* v. *North Texas Co.*, 281 U.S. 11; *Milton S. Yunker*, 26 T.C. 161, reversed and remanded without discussion of this point 256 F. 2d 130 (C.A. 6, 1958); and *Commissioner* v. *Swift*, 54 F. 2d 746 (C.A. 9, 1932), affirming 20 B.T.A. 1099. Furthermore, it appears that under California law the written amendment to the original escrow was sufficient, without more, to alter the terms of that prior contract. Cal. Civ. Code secs. 1698, 1700. These conclusions, however, are not dispositive of the issue before us.

We are satisfied from the record that petitioners acquired the Salinas property as purchasers for cash through the Salinas escrow and exercised control over the title thereto. By the terms of that escrow petitioners were unconditionally liable for a purchase price of $190,000. Nothing in the record indicates that Alloy was the purchaser of the Salinas property. Nor is there any indication that Alloy was liable

for any part of the purchase price of that property. Petitioners have introduced no evidence which would substantiate the possibility that petitioners merely acted for Alloy in acquisition of the Salinas property. Thus, we are not faced with a situation in which a party wishing to acquire title to a taxpayer's property acts independently, and for itself, to acquire another piece of property desired by the taxpayers in order to exchange it for the property which the purchaser wants. We have held that where such facts exist, and the so-called purchaser acts for himself and not as agent for the taxpayer, the subsequent exchange is within the meaning of the statute. *Mercantile Trust Co. of Baltimore, et al., Executors*, 32 B.T.A. 82; cf. *W. D. Haden Co.*, 165 F. 2d 588 (C.A. 5, 1948), affirming on this issue a Memorandum Opinion of this Court.

In *Mercantile Trust Co., supra*, the property ultimately received by the taxpayers in exchange for their property was acquired by a third party without any activity toward that end by the taxpayer. We said there at 32 B.T.A. 85:

In our opinion, the respondent's position cannot be sustained unless the Title Co. [the third party] represented the petitioners as *their* agent, both in the transfer of the Baltimore Street property to the Emerson Hotel Co., and in the purchase of the Lexington Street property. The record, however, conclusively contradicts the existence of that status in either transaction. Petitioners' only contract disclosed here was with the Title Co. *alone.*

The *W. D. Haden* case likewise presents a three-cornered transaction in which the taxpayer's only involvement was in a pure exchange of his property for like property. These cases, upon which petitioners rely, are distinguishable from the facts in the instant controversy. Cf. *Fidelity-Philadelphia Trust Co., Executor*, 23 B.T.A. 620.

We thus arrive at the question whether, when petitioners contracted to purchase the Salinas property and had title thereto transferred to Alloy, which then conveyed title to petitioners and received title to the Buena Park property, the transaction constituted a nontaxable exchange within the meaning of section 1031 (a).

Two points are immediately clear. First, Alloy's acquisition of title to the Salinas property *after* the agreement to exchange it for the Buena Park property does not remove the transaction from the nonrecognition umbrella of section 1031 (a). *Century Electric Co.*, 15 T.C. 581, affd. 192 F. 2d 155 (C.A. 8, 1951), certiorari denied 342 U.S. 954. Secondly, petitioners' payment of cash (the $19,000 paid into the Salinas escrow) likewise does not make the nonrecognition provisions of section 1031 (a) unavailable. *George E. Hamilton*, 30 B.T.A. 160.

We conclude, however, that in essence petitioners acquired the Salinas property in a separate transaction; that the payment of $172,871.40 made by Alloy was a payment made for petitioners; and

that petitioners do not thereafter bring themselves within the provisions of section 1031(a) by the formal gesture of arranging that title shall pass through Alloy to them, for, in fact, they did not acquire the Salinas property in exchange for the Buena Park property. Refinements of title will not blind us to the realities of the transaction. Cf. *Griffiths* v. *Commissioner*, 308 U.S. 355. We are satisfied that Alloy paid the purchase price for the Buena Park property into the Salinas escrow with the clear understanding that it would receive title to the Buena Park property after acting as a conduit for title to the Salinas property. Thus, petitioners received $172,871.40 for the Buena Park property to which amount they became unconditionally entitled upon transfer of title to that property to Alloy.

Petitioners did not exchange their property for other property of a like kind. They sold the Buena Park property and reinvested the proceeds therefrom, together with other money, in the Salinas property.[5] Accordingly, the transaction here involved is not within the provisions of section 1031(a) and petitioners are taxable upon the sale of the Buena Park property.

*Decision will be entered for the respondent.*

---

[5] The purchase price of the Salinas property was $190,000. Petitioners paid $19,000 into the Salinas escrow and Alloy paid in $172,871.40. The surplus was returned to petitioners.