Antone Borchard and Anna A. Borchard v. Commissioner.
Borchard v. Commissioner
Docket No. 585-63.
United States Tax Court
T.C. Memo 1965-297; 1965 Tax Ct. Memo LEXIS 33; 24 T.C.M. (CCH) 1643; T.C.M. (RIA) 65297; November 9, 1965
*33 Held: On the facts presented, the series of events in which petitioners disposed of their Orange County property and acquired property in Imperial County was not a sale and purchase but was a tax-free exchange of properties of like kind within the meaning of section 1031, I.R.C. 1954. Alan N. Halkett and Henry C. Diehl, for the petitioner. Marion Malone, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined a deficiency of $121,500.88 in the income tax of petitioners Antone and Anna A. Borchard for the taxable year 1958. The sole issue for decision is whether the transfer by petitioners of certain parcels of land constituted a taxable *34 sale or a nontaxable exchange. Findings of Fact Some of the facts have been stipulated and the Stipulation of Facts and exhibits attached thereto are incorporated herein by this reference. The petitioners are husband and wife presently residing in Santa Ana, California. They filed a joint income tax return for the year 1958 with the district director of internal revenue at Los Angeles, California. In February 1957, and at all times thereafter until on or about January 7, 1958, petitioners jointly were the owners of two parcels of real property located in Orange County, California, which two parcels comprised approximately 160 acres in total. These two parcels together will hereinafter be referred to as the Orange County property. During 1957 and for many years prior thereto, petitioners used the Orange County property for agricultural purposes. During the latter part of 1956 Reginald F. Keller, a real estate broker, hereinafter referred to as Keller, was employed by Burroughs Corporation to locate a parcel of real property within a radius of approximately 30 miles of the City of Los Angeles which Burroughs might acquire for a manufacturing plant site. At some time on or before *35 February 28, 1957, Keller contacted petitioners and inquired whether they would be interested in selling their Orange County property. Petitioners told Keller that they might consider selling the property but they would prefer to exchange it for other farm property. Keller told petitioners that he and his client, Burroughs Corporation, would not enter into a transaction with petitioners if the consummation of such transaction were dependent solely upon the parties' ability to make an exchange; Keller and Burroughs wanted assurance that Burroughs could acquire the property even if an exchange could not be worked out. Keller also advised petitioners that any transaction must be contingent upon the proper zoning of the property for his client's use. Burroughs only needed about 65 acres, but petitioners would not consider transferring anything less than the entire 165 acres. Petitioners said they would consider a sale at $6,000 an acre, but suggested that Keller speak to their son-in-law who was an attorney. Keller informed Burroughs about the possible availability of the Orange County property, advising that the acreage beyond the corporation's needs for its plant could be resold at *36 no loss. Burroughs was interested and wanted to make soil tests and investigate other matters such as sewers, water, lights, curbs, sidewalks and labor supply, but it would not proceed further without some form of option on the property. On February 28, 1957, petitioners gave to Keller a written option to acquire the Orange County property, which option provided in pertinent part as follows: During this period you may assign this option to a responsible major national manufacturing corporation, or to any other responsible organization or individual satisfactory to us. On or before April 15, 1957, this option may be exercised by you, or by your assignee, by the opening of a proper escrow at the Title Insurance & Trust Company, Santa Ana, California, which escrow shall include the following provisions: 1. This escrow will close on October 1, 1957, and we shall be entitled to the proceeds of all crops grown on said property during the current season. 2. The consideration for said property, at our option, shall be either other real property acceptable to us, or shall be the net sum of $960,000.00 cash, or shall be a combination of such real property and cash. In the event such *37 real property shall not be found prior to the close of this escrow, we shall nevertheless be obligated to convey said property at the close of this escrow for the sum of $960,000.00 cash. 3. The sum of $25,000.00 cash shall be deposited upon the opening of this escrow, which sum shall be credited against the purchase price of such other real property, or against the purchase price of this property, as the case may be, at the close of this escrow. In the event this escrow is cancelled by you or your assignee, said sum shall be immediately paid to us. 4. This escrow shall be made contingent upon the ability of you or your assignee to secure the annexation of said property to the City of Santa Ana, and to secure a use variance, or change of zone, as the case may be, covering the proposed use of said property by you or your assignee. [Emphasis supplied.] On or about March 5, 1957, petitioners delivered to Keller a written modification of the option dated February 28, 1957. This modification was in all material respects a repetition of the terms of the original document with the exceptions that a recital of nominal consideration for the granting of the option was added and the *38 following sentence was added to the end of the paragraph numbered 2 in the above-quoted excerpt: In no event shall your obligation for the purchase price of said property (whether by purchasing other property or by direct purchase) exceed the sum of $960,000.00. On or about April 8, 1957, petitioners delivered to Keller a further modification of the option. This modification extended the option termination date from April 15 to April 29, 1965, and it extended the date for close of escrow (i.e., the date by which petitioners would be required to deed the property to the transferee if the option were exercised) from October 1, to November 15, 1957. On April 25, 1957, an escrow was opened at Title Insurance and Trust Company, Santa Ana, California (hereinafter referred to as "Title Co."), between petitioners and Burroughs Corporation. On that date petitioners and Burroughs executed a form document entitled "EXCHANGE ESCROW INSTRUCTIONS," which contained the following pertinent provisions: [1]
EXCHANGE ESCROW INSTRUCTIONS Escrow No. 241810 MGL cb Santa Ana, California April 25, 1957 TITLE INSURANCE AND TRUST COMPANY: On or before October 1, 1957, I will hand you or cause *39 to be handed you a deed or deeds covering real property acceptable to Borchards or the net sum of $960,000.00 cash or a combination of real property and cash, and I hand you the sum of $25,000.00 herewith which sum shall be credited against the purchase price as herein provided. (The description of property so selected by Borchard to be furnished you at a later date and made a part of these instructions.) (herein referred to as FIRST property) * * *
providing you obtain for me a deed to [A detailed description of the Orange County property is here inserted.] (herein referred to as SECOND property) The closing of this escrow is contingent upon the ability of R. F. Keller and/or Burroughs Corporation to secure: (a) The annexation of said property to the city of Santa. All on terms acceptable to R. F. Keller and/or Burroughs Corporation. (b) A Use Variance, or change of zone as the case may be, covering the proposed use of said property by Burroughs Corporation, all on terms acceptable to said corporation. *40 (c) Title in form satisfactory to Burroughs Corporation and/or R. F. Keller. As a memorandum in this escrow with which Title Insurance and Trust Company is in no way to be concerned, it is mutually agreed that these instructions are entered into by the parties hereto for the purpose of enabling Title Insurance and Trust Company to close this escrow but it is in no way intended to in any way modify, supplement or supersede that certain agreement executed by and between R. F. Keller and Antone Borchard and Anna A. Borchard, dated March 5, 1957, as amended. In the event said escrow is cancelled by Burroughs Corporation and/or R. F. Keller for any reason other than the three contingencies above shown the $25,000.00 deposited herewith shall be immediately paid to the Borchards as liquidated damages, it being understood that it will be impossible or impracticable to determine actual damages in such event. However, if said escrow is cancelled by the Burroughs Corporation and/or R. F. Keller under any of the three contingencies above shown, said $25,000.00 is to be refunded to said Burroughs Corporation and/or R. F. Keller. In the event said escrow is cancelled for any reason whatsoever *41 Burroughs Corporation and/or R. F. Keller agree to deliver all engineering data, maps, surveys, soil test reports and any other data pertaining to said land to the Borchards. * * * [Here there appear signatures of Keller and an official of Burroughs Corporation.] Santa Ana, California
TITLE INSURANCE AND TRUST COMPANY: April 25, 1957 I have read and approve the foregoing instructions. On or before October 1, 1957 19 - I will hand you a deed to said SECOND property to the vestee shown, executed by the undersigned which you will deliver when you obtain for me a deed to * * * property acceptable to the undersigned and when you can issue your title insurance policy on the title to said land * * * and when you hold for me the sum of $960,000.00 in cash or property. * * *
In the event real property acceptable to the undersigned shall not be found prior to the closing date of this escrow, we shall nevertheless be obligated to convey "Second Property" at the close of said escrow for the sum of $960,000.00 cash. In no event shall R. F. Keller and/or Burroughs Corporation's obligation for the purchase price of said property (whether by purchasing other property or *42 by direct purchase) exceed the sum of $960,000.00. [At the end of the document there appear spaces for the signatures of both petitioners.] [2]
The escrow established by this document will hereinafter sometimes be referred to as Escrow No. 241810. The $25,000 referred to in the above-quoted excerpts from Escrow No. 241810 was deposited by Keller on behalf of Burroughs, as provided. By two separate written amendments to the escrow instructions, dated July 31, 1957, and December 26, 1957, the date for closing of the escrow was extended to January 7, 1958. During the autumn of 1957 petitioners secured the annexation of the Orange County property to the City of Santa Ana and arranged for the rezoning of the property from residential to light industrial, both of which actions were conditions precedent to the closing of Escrow No. 241810. During 1957 petitioners attempted to locate other suitable real property which they *43 might be willing to accept from Burroughs in exchange for their Orange County property. Prior to 1957 they had owned property in Imperial County, California, and they had for many years prior to 1957 looked at Imperial County properties with a view to some day acquiring a parcel there in exchange for their Orange County property. After contacting real estate brokers in 1957, petitioners located four separate parcels of real property in Imperial County which they were willing to take in trade. These four parcels were owned by separate individuals, hereinafter referred to, respectively, as Singh, Church, W. Ferguson and C. Ferguson. The prices at which these individuals would sell their properties were ascertained by petitioners through real estate brokers representing the individuals, however, petitioners at no time ever committed themselves either orally or in writing to buy any of these properties. In a letter to Burroughs dated November 4, 1957, petitioners approved escrow instructions proposed to be entered between Burroughs and the Churches and to accept the Churches' Imperial County property "in partial satisfaction (to the extent of $600,000.00)" of Burroughs' obligations under *44 Escrow No. 241810. On that same date Burroughs and the Churches entered into an escrow (hereinafter referred to as the Church escrow) for the purchase by Burroughs of the Church property for $600,000, and escrow instructions were executed. In three separate letters dated December 18, 1957, petitioners notified Burroughs that they would accept the Singh, W. Ferguson and C. Ferguson properties in partial satisfaction of Burroughs' obligations under Escrow No. 241810. These letters were all identical in material respects to the November 4, 1957, letter referred to above. The letters agreed to accept the Singh property in satisfaction of Burroughs' obligations "to the extent of approximately $36,000.00," the W. Ferguson property "to the extent of approximately $207,500.00," and the C. Ferguson property "to the extent of approximately $112,460.00." Also on December 18, 1957, Burroughs entered into three separate escrows with the Singhs, W. Ferguson, and C. Ferguson, respectively, for the purchase by Burroughs of their respective Imperial County properties at prices corresponding to the amounts referred to above in the respective letters from petitioners to Burroughts. Escrow instructions *45 were executed. The escrows for the purchase by Burroughs of all four Imperial County properties were entered with Title Co., the same escrow agent involved in Escrow No. 241810. Each of the four contained a clause making closing contingent upon the closing of Escrow No. 241810; each provided that Burroughs would pay no charges. On January 6, 1958, Keller, acting for Burroughs, delivered to Title Co. a check issued by Burroughs in the amount of $937,707.60. On January 7, 1958, all of the five escrows to which Burroughs was a party were closed. On the same day, four separate deeds were recorded in the County Recorder's office of Imperial County conveying the Singh, Church, W. Ferguson and C. Ferguson properties to Burroughs. Also on January 7, 1958, four separate deeds conveying these properties from Burroughs Corporation to petitioners were recorded, and the Orange County property was conveyed by petitioners to Burroughs. Prior to the transfer of the Orange County property to Burroughs, petitioners held it for productive use for agricultural purposes in their trade or business or for investment, and not primarily for sale. In 1957 the Church, Singh, W. Ferguson and C. Ferguson *46 properties were being used for agricultural purposes, and petitioners continued to use them for agricultural purposes in their trade or business or as an investment after they were acquired by petitioners in January 1958. All of these properties were of a like kind. Opinion It is the position of petitioners that the transactions detailed in our Findings of Fact constituted a tax-free exchange of properties of like kind within the meaning of section 1031 of the 1954 Code. [3]
Respondent, on the other hand, determined that the transactions amounted to a sale by the petitioners of *47 the Orange County property followed by a purchase by them of the Imperial County properties, and that there was a taxable long-term capital gain on the sale of the Orange County property. The principal issue for our decision is simply stated as follows: Does a transaction which takes the form of an exchange fail to qualify under section 1031 because the taxpayer-transferor was obligated to deliver for cash but prior to closing date exercised an option to accept like property instead of cash? We have considered this basic question before. Mercantile Trust Company of Baltimore, 32 B.T.A. 82 (1935), acq. XIV-1 C.B. 13 (1935); James Alderson, 38 T.C. 215 (1962), reversed 317 F.2d 790 (C.A. 9, 1963); cf. W. D. Haden Co., 165 F. 2d 588 (C.A. 5, 1948), affirming a Memorandum Opinion of this Court on this issue. In Mercantile Trust the taxpayer entered into a contract with Title Guarantee and Trust Co. to exchange properties for other properties not then owned by Title Guarantee. In the event that Title Guarantee could not obtain ownership of the desired property, the taxpayers agreed to sell and Title Guarantee to buy taxpayers' *48 property for $300,000 cash. Four days later Title Guarantee signed a contract with the owners of the specified exchange property to purchase it, and at the same time agreed to sell the taxpayer's property it would acquire in the exchange to a third party for $300,000 cash. The following month the transactions were closed; taxpayers deeded their property to Title Guarantee; Title Guarantee deeded the property it had purchased for the purpose of making the exchange to taxpayers. Title Guarantee deeded the property it thus acquired from taxpayers to the third party for $300,000. The Commissioner disregarded the form of the transactions and determined that taxpayers had made a sale of their property rather than an exchange. It was urged that Title Guarantee was an agent or dummy and that the transaction was a sham and a fictitious device which should be disregarded. We rejected respondent's arguments and held that there was an exchange of like properties not a sale so that the nonrecognition of gains provisions of the Code applied. In James Alderson, supra, a case similar to the instant case in its superficial factual context, yet factually distinguishable in several legally *49 significant respects, we held that there was a sale, and not an exchange as the taxpayers contended. In that case, as in this case, the petitioners owned farm property in Orange County, California. They entered into an agreement to sell their land to a corporation (referred to as Alloy) for cash, and an escrow was opened for that purpose. They did not advise the purchaser that they intended or desired to make an exchange. Several months later the taxpayers located other property in Monterey County which they wished to acquire. Taxpayers and Alloy then executed an amendment to their escrow to provide that Alloy would acquire the Monterey County property, and then exchange it for the taxpayers' property. On the same day as this amendment was executed, taxpayers, not Alloy, entered into an escrow to purchase the Monterey County property from its then owners, instructing that the deed thereto should be delivered to Alloy. Subsequently Alloy deposited into the Monterey County property escrow the exact amount of cash which Alloy had originally agreed to pay for the Orange County farm. The Monterey County property was deeded to Alloy and Alloy then deeded it to the taxpayers, and received *50 from them a deed to the Orange County farm. We held that the series of steps taken in Alderson amounted to a sale and purchase and not an exchange. We concluded that the taxpayers had been the true purchasers of the Monterey County property and that Alloy took title thereto merely as a conduit through which title was actually conveyed from the owners of the property to taxpayers. Such is not the situation in the instant case. [4]
The critical distinction between this case and Alderson, as we view the facts, is that in Alderson the taxpayers entered into a contract to sell their property to Alloy for cash and made no contract at that time for an exchange. Thereafter, acting for themselves, they took the steps which led to the conveyance by the owners of the Monterey County property to Alloy. There the petitioners executed the escrow for the conveyance of that property, and *51 by the terms of that escrow they were unconditionally liable for the purchase price. We stated at page 221: Nothing in the record indicates that Alloy was the purchaser of the [Monterey County] property. Nor is there any indication that Alloy was liable for any part of the purchase price of that property. Petitioners have introduced no evidence which would substantiate the possibility that petitioners merely acted for Alloy in acquisition of the [Monterey County] property. Thus, we are not faced with a situation in which a party wishing to acquire title to a taxpayer's property acts independently, and for itself, to acquire another piece of property desired by the taxpayers in order to exchange it for the property which the purchaser wants. Unlike Alderson, we are here faced with the situation described in the last quoted sentence. With the exception of locating the parcels and ascertaining the selling prices, petitioners here took no part in the acquisition of title to the four Imperial County properties by Burroughs. Petitioners entered no negotiations to purchase those properties, nor agreements, formal or informal, oral or written, with any of the Imperial County land owners. *52 It was Burroughs that negotiated and contracted with these land owners; Burroughs that entered the four escrows with them; Burroughs that put up the cash used to purchase the four parcels; and Burroughs to which the owners deeded the property. On these facts there can be little question that it was Burroughs, not petitioners, that purchased the Imperial County farms for which petitioners then exchanged their Orange County land. The key distinction [5] between the instant case and Alderson is the same as the distinction we recognized in Alderson between that case and our earlier decision in Mercantile Trust Company of Baltimore, supra, in which we held, on facts even more favorable to respondent but substantially identical to those before us here, that there was a tax-free exchange. *53 Respondent argues that while in form the transaction may have been an exchange, in substance it amounted to a sale and purchase. This was not the case in Mercantile Trust Company of Baltimore, supra, and as we view the facts herein, it is not the case here. Respondent at trial, and to a more limited extent on brief, contended that petitioners' Orange County property was held primarily for sale and was therefore specifically excluded from the nonrecognition provisions of section 1031, and also that the Orange County and Imperial County properties were not of like kind. Our Findings indicate our conclusions as to those matters. To the extent these positions were not abandoned on brief we hold that they are without merit. Petitioners have satisfactorily proved that their Orange County property and the Imperial County properties were farm lands held by them for productive use in their trade or business or for investment. See section 1.1031(a)-1(b), Income Tax Regs.
Decision will be entered for the petitioners. Footnotes
1. Italics indicates that the matter italicized was inserted into blank space provided in the printed form. Material not italicized is part of printed form.↩
2. Although the document contains spaces for signatures of both petitioners, neither petitioner's signature appears on the copy stipulated into evidence as Exhibit 4-D. However, the Stipulation of Facts recites that petitioners "executed" this document.↩
3. SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT. (a) Nonrecognition of Gain or Loss From Exchanges Solely in Kind. - No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.↩
4. Although we find this case distinguishable on its facts from James Alderson, 38 T.C. 215 (1962), we note that on appeal even the facts in Alderson were regarded by the Court of Appeals as resulting in a tax-free exchange. Alderson v. Commissioner, 317 F. 2d 790↩ (C.A. 9, 1963).
5. Another factual distinction between the two cases is that in Alderson the original transaction between taxpayers and Alloy was a straight cash sale which was later amended after taxpayers located property they wished to acquire and then advised Alloy that they desired to make a trade rather than a sale; in the instant case petitioners at all times desired and intended to make an exchange and so advised Burroughs, and the transaction from the outset contemplated an exchange.↩