T.C. Memo. 1996-150


UNITED STATES TAX COURT


RAYMOND ST. LAURENT, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23048-93.                    Filed March 25, 1996.


<u>Bryan M. Dench</u>, for petitioner.

<u>William T. Hayes</u> and <u>Louise R. Forbes</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined a deficiency of $125,887 in petitioner's 1988 Federal income tax.  After concessions, the only issue remaining for decision is whether, pursuant to section 1031(a), petitioner may defer recognition of gain realized upon the sale of certain real property.  Unless

otherwise indicated, all section references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

At the time the petition in the instant case was filed, petitioner resided in Lewiston, Maine.

During 1988, petitioner and his ex-wife, Phyllis St. Laurent, owned, as tenants in common, an apartment complex known as RPDS Estates (RPDS) located in Auburn, Maine. Petitioner decided to sell RPDS and acquire other real property in which Ms. St. Laurent would not have an interest. Petitioner intended to dispose of his interest in RPDS by exchanging it for other property in a manner that would entitle him to nonrecognition treatment of the gain realized pursuant to section 1031(a).

On May 9, 1988, petitioner and Ms. St. Laurent agreed to sell RPDS to Richard and Barbara Labbe for $1,900,000. The purchase and sale agreement (sale agreement) signed by them provided that "It is agreed between the parties that Purchasers shall assist Seller in consummating a Section 1031 Tax Deferred Exchange. Seller shall indemnify Purchaser of any legal or accounting costs of said exchange."

After the sale agreement was signed, petitioner began looking for property to replace his interest in RPDS, but he had not selected replacement property by the time the sale of RPDS closed. The closing was delayed pending regulatory approval of

the sale and performance of certain work on RPDS.  The closing

took place November 4, 1988, and on that date petitioner and Ms.

St. Laurent transfered RPDS to the Labbes for $1,880,000.  As

part of the closing, the sale agreement was amended (amendment)

to provide procedures by which an exchange of properties would be

effected.  The amendment provided in pertinent part:

> In lieu of the terms of sale described above in this
> Agreement, the Sellers may, at their exclusive option,
> designate one or more properties (the "Exchange
> Property") to be acquired by Buyer and exchanged with
> the Sellers for the Property to be transferred
> hereunder in a manner intended to qualify as a tax free
> exchange of properties under Section 1031 of the United
> States Internal Revenue Code of 1986, as amended (the
> "Exchange").  Buyer makes no representation that the
> Exchange will qualify under Section 1031 of the U.S.
> Internal Revenue Code of 1986, as amended.  Buyer
> agrees to cooperate with the Sellers in the purchase of
> the Exchange Property designated by the Sellers,
> including negotiation for the purchase of the Exchange
> Property; to execute, but not otherwise prepare,
> contracts, documents and instruments as requested in
> writing by the Sellers; to purchase the Exchange
> Property designated by the Sellers; and to execute all
> other documents necessary to consummate the Exchange as
> reasonably requested in writing by the * * * Sellers.
> Buyer shall have no obligation to find or select the
> Exchange Property; shall not be responsible for the
> negotiation of the terms of such acquisition or the
> preparation of the documents containing such terms;
> shall not be responsible for the failure of such
> purchase of the Exchange Property to be fully closed or
> settled; shall not be required to advance any funds on
> behalf of the Exchange prior to the settlement
> hereunder; and shall not be required to advance any
> funds above the purchase price of the Property and
> other sums otherwise payable by Purchaser hereunder for
> the Property, as a result of any such Exchange.  The
> Exchange shall be accomplished by any of the following
> methods, at the sole option of the Sellers:

> * * * * * * *

(B)   A delayed like kind exchange, whereby the purchase price shall be paid by Buyer to Coastal Savings Bank of Portland, Maine (the "Escrow Agent"), as escrow holder, for a term of one hundred eighty (180) days after settlement (the "Exchange Period") and the deed conveyed to Buyer and the settlement otherwise consummated as elsewhere herein provided.  The entire purchase price shall be held by the Escrow Agent in an interest-bearing account.  Within forty-five (45) days of the settlement (the "Designation Period"), the Sellers may designate in writing the Exchange Property to be acquired by Buyer with the escrowed money, the costs of which are to be paid from the escrowed money.  If the Sellers fail to designate an Exchange Property within the Designation Period, then upon the expiration of the Designation Period, the Escrow Agent shall pay to the Sellers the escrowed money and all interest accrued thereon.  If the Sellers designate the Exchange Property during the Designation Period, but the Exchange Property is not transferred to the Sellers before the end of the Exchange Period, then upon termination of the Exchange Period, the Escrow Agent shall pay to the Sellers the escrowed money and all interest accrued thereon.  The Sellers shall have no right to receive the escrowed money or interest accrued thereon prior to the earlier of (i) settlement on the Exchange Property, (ii) termination of the Designation Period without the Sellers having designated the Exchange Property, or (iii) termination of the Exchange Period.  All funds remaining in the escrow upon termination of the Exchange Period or after settlement on the Exchange shall, after paying the Exchange Price, be paid to the Sellers.

(C)   Any other arrangement mutually satisfactory to the Sellers and Buyer whereby the Exchange Property is conveyed to the Sellers and the Property is conveyed to Buyer.

Two checks in the amount of $390,500.30, made payable to the order of Coastal Savings Bank-Escrow Agent (escrow agent), were

received by petitioner and Ms. St. Laurent at the closing. Petitioner delivered his check to the escrow agent on November 4, 1988, and it was deposited in an escrow account that was opened for the benefit of petitioner on November 14, 1988.  A bank officer assisted petitioner in establishing the escrow account, and thereafter, the officer's function was as a signatory on the account.  The officer was not an agent of petitioner.

Petitioner continued to search for suitable exchange properties subsequent to the closing on RPDS, viewing 40 to 50 properties.  The Labbes did not search for the properties, and petitioner did not discuss with them the properties he was considering.  Petitioner was advised to furnish a list of replacement properties to the escrow agent because it was required under the law governing like-kind exchanges.  Pursuant to that advice, petitioner sent a letter dated December 16, 1988, to the escrow agent in which he listed 20 properties that were identified pursuant to section 1031 as like-kind property to be received in exchange for his interest in RPDS.  The letter was received by the escrow agent on or before December 19, 1988.  The properties designated included Hillview Estates (Hillview), a 40-unit trailer park in Turner, Maine, and a lot on Sheffield Street in Lewiston, Maine (Sheffield lot).

Petitioner subsequently negotiated for the purchase of Hillview, and, on January 30, 1989, petitioner signed an agreement to buy Hillview.  The Labbes were not parties to the

agreement.  The agreed purchase price was $500,000, consisting of $390,000 to be paid from the escrow account and a $110,000 seller-financed mortgage.  By letter dated March 20, 1989, petitioner requested the escrow agent to release the funds in the escrow account to the law firm handling the closing for Hillview. On March 22, 1989, petitioner closed on Hillview.  The Labbes did not participate in, nor were they present at, the closing.

Petitioner and Ms. St. Laurent timely filed a joint Federal income tax return for 1988 on April 15, 1989.  They did not request an extension of time to file such return.

On May 17, 1989, petitioner closed on the Sheffield lot.

OPINION

Section 1001 generally requires recognition of the entire amount of gain or loss on the sale or exchange of property. Section 1031(a)(1), however, provides for the nonrecognition of such gain or loss on "the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."  For transfers after July 18, 1984, section 1031(a)(3), enacted as part of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, sec. 77(a), 98 Stat. 494, 595, governs deferred like-kind exchanges.  Section 1031(a)(3) provides:

>     (3)  Requirement that property be identified and
> that exchange be completed not more than 180 days after
> transfer of exchanged property.--For purposes of this

subsection, any property received by the taxpayer shall be treated as property which is not like-kind property if--

(A) such property is not identified as property to be received in the exchange on or before the day which is 45 days after the date on which the taxpayer transfers the property relinquished in the exchange, or

(B) such property is received after the earlier of--

(i) the day which is 180 days after the date on which the taxpayer transfers the property relinquished in the exchange, or

(ii) the due date (determined with regard to extension) for the transferor's return of the tax imposed by this chapter for the taxable year in which the transfer of the relinquished property occurs.

Although the transactions in issue are deferred like-kind exchanges the tax consequences of which are governed by section 1031(a)(3), we precede our consideration of the statute by looking to certain pre-DEFRA case law that continues to be generally applicable to like-kind exchanges. In structuring their transactions as tax-deferred like-kind exchanges, taxpayers have been allowed great latitude. Biggs v. Commissioner, 69 T.C. 905, 913 (1978), affd. 632 F.2d 1171 (5th Cir. 1980). For instance, an agreement to sell property for cash may be converted into a like-kind exchange before substantial implementation of the transaction occurs. Coupe v. Commissioner, 52 T.C. 394, 405 (1969). Multiple parties may be involved in an exchange where the potential buyer of the taxpayer's property does not own any

property at the time that the agreement to exchange is signed. Biggs v. Commissioner, supra at 913-914. Exchange property need not be identified at the time an agreement to effect an exchange is made. Alderson v. Commissioner, 317 F.2d 790 (9th Cir. 1963), revg. 38 T.C. 215 (1962). Proceeds of the sale of property to be exchanged may be placed in escrow and, provided the taxpayer does not constructively receive the proceeds, an exchange involving property acquired with the proceeds will qualify for the benefits of section 1031(a). Garcia v. Commissioner, 80 T.C. 491, 499-500 (1983). The taxpayer may locate and negotiate for the property to be exchanged. Biggs v. Commissioner, supra at 915. The buyer need not hold title to the exchange property received by the taxpayer. Biggs v. Commissioner, 632 F.2d at 1177. Where a preference for exchange is manifest, and an exchange actually occurs, courts generally ignore the possibility that a sale of the taxpayer's property may occur if the exchange does not actually take place. Mercantile Trust Co. v. Commissioner, 32 B.T.A. 82, 87 (1935).

Although considerable latitude has been allowed by the courts with respect to the structure of like-kind exchanges, that latitude is not open ended. Estate of Bowers v. Commissioner, 94 T.C. 582, 590 (1990). A taxpayer's intent to effect a section 1031(a) transaction is not determinative of the transaction's tax treatment, although intent is given deference where the parties

to the transaction have acted consistently therewith. Garcia v. Commissioner, supra at 498.

In the instant case, respondent makes two principal arguments that the RPDS/Hillview exchange transaction fails to qualify for tax-deferred treatment pursuant to section 1031(a). Respondent's first objection is that, in acquiring Hillview himself, petitioner failed to observe the terms of the amendment to the sale agreement that provided that the Labbes would purchase the property to be exchanged for his interest in RPDS. Secondly, respondent contends that petitioner's identification of 20 replacement properties exceeds the limitation on the number of replacement properties that may be designated pursuant to section 1031(a)(3), and that the particular replacement property received in the exchange was not subject to determination by contingencies beyond the control of the parties to the exchange.

As to respondent's first contention, the amendment to the sale agreement makes clear that the manner in which the exchange transaction was to be effected was almost exclusively within petitioner's control. We view the Labbes' undertakings in the amendment with respect to the acquisition of property to be exchanged for petitioner's interest in RPDS as merely accommodations to petitioner to ensure that the Labbes would perform whatever acts that might be deemed necessary to cause an exchange to qualify for like-kind exchange treatment pursuant to section 1031(a). Moreover, the amendment provides that, in

addition to the methods set forth therein, the exchange of petitioner's interest in RPDS for like-kind property may be effected in any other manner mutually satisfactory to the parties thereto.

Respondent concedes that it was not necessary for the Labbes to take title to Hillview in order for the exchange of petitioner's interest in RPDS for such property to meet the requirements of section 1031(a). See Biggs v. Commissioner, 632 F.2d at 1177. Consequently, we do not consider it significant, for purposes of section 1031(a), that the parties to the amendment did not follow the procedure for acquiring the replacement property (i.e., Hillview). Moreover, by their conduct, we treat petitioner and the Labbes as having adopted, pursuant to the provisions of the amendment, a mutually satisfactory alternative method for accomplishing the exchange of petitioner's interest in RPDS for Hillview.

We next consider respondent's argument concerning the provisions of section 1031(a)(3). As noted above, respondent argues that petitioner's identification of replacement properties did not satisfy section 1031(a)(3)(A) because (1) petitioner identified 20 properties as replacement properties, and (2) the particular replacement properties to be received were not to be determined by contingencies beyond the control of the parties to the exchange. Respondent relies on the following passage in the conference report on DEFRA:

The conferees note that the designation requirement in the conference agreement may be met by designating the property to be received in the contract between the parties. <u>It is anticipated that the designation requirement will be satisfied if the contract between the parties specifies a limited number of properties that may be transferred and the particular property to be transferred will be determined by contingencies beyond the control of both parties</u>. For example, if A transferred real estate in exchange for a promise by B to transfer property 1 to A if zoning changes are approved and property 2 if they are not, the exchange would qualify for like-kind treatment. * * * [H. Conf. Rept. 98-861, at 866 (1984), 1984-3 C.B. (Vol. 2) 1, 120; emphasis supplied.]

After the year in issue, the Commissioner issued regulations providing that, in general, a taxpayer may identify either (1) a maximum of three properties as replacement properties, or (2) any number of properties provided the fair market value of the designated properties does not exceed 200 percent of the fair market value of all properties relinquished by the taxpayer in the exchange. Sec. 1.1031(k)-1(c)(4), Income Tax Regs., T.D. 8346, 1991-1 C.B. 150, 157. The regulations, however, are prospective only, as they apply to transfers of property made on or after June 10, 1991, or in certain cases, to transfers made on or after May 16, 1990.[1] Sec. 1.1031(k)-1(o), Income Tax Regs.,

---

[1] Because the Commissioner's regulations are not applicable to the transactions in issue, we express no opinion concerning the regulations' validity. We note, however, where a statute is silent or ambiguous with respect to an issue that is the subject of a regulation, a reviewing court need only decide whether the regulation is based on a permissible construction of the statute. <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 843 (1984).

T.D. 8346, 1991-1 C.B. at 165.  The Commissioner included no requirement in the regulations that the particular replacement property to be received by a taxpayer be determined by contingencies beyond the control of the parties to the exchange. Sec. 1.1031(k)-1(c), Income Tax Regs., T.D. 8346, 1991-1 C.B. at 156.

Petitioner argues that section 1031(a)(3)(A) does not expressly limit to less than 20 the number of replacement properties that may be designated and that the exchange of petitioner's interest in RPDS for Hillview complied with the literal language of section 1031(a)(3).  We agree.

As the regulations are not before us, the issue presented in the instant case is one of statutory interpretation.  In construing section 1031(a)(3)(A), our task is to give effect to the intent of Congress, and we must begin with the statutory language, which is the most persuasive evidence of the statutory purpose.  United States v. American Trucking Associations, Inc. 310 U.S. 534, 542-543 (1940).  Ordinarily, the plain meaning of the statutory language is conclusive.  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241-242 (1989).  Where a statute is silent or ambiguous, we may look to legislative history in an effort to ascertain congressional intent.[2]  Burlington No. R. Co.

---

[2]    Of course, even where the statutory language appears to be clear, we are not precluded from consulting legislative history.
(continued...)

v. Oklahoma Tax Commn., 481 U.S. 454, 461 (1987); Griswold v. United States, 59 F.3d 1571, 1575-1576 (11th Cir. 1995); Mississippi Poultry Association, Inc. v. Madigan, 992 F.2d 1359, 1364 n.28 (5th Cir. 1989). Legislative history that is inconclusive, however, should not be relied upon to supply a provision not enacted by Congress. United States v. American College of Physicians, 475 U.S. 834, 846-847 (1986).

The statute is silent and does not contain either a restriction on the number of replacement properties that may be identified or a requirement that the replacement property be determined by contingencies beyond the control of the parties to the exchange. Consequently, we may look to the legislative history in order to decide whether Congress intended that an identification of replacement properties conform to the requirements urged by respondent in order to be effective. We, however, do not find the conference report to be conclusive as to the number of replacement properties that a taxpayer may identify. The conference report merely states: "It is anticipated that the designation requirement will be satisfied if the contract between the parties specifies a limited number of properties that may be transferred". H. Conf. Rept. 98-861, supra at 866, 1984-3 C.B. (Vol 2) at 120 (emphasis supplied). It

---

[2](...continued)
United States v. American Trucking Associations, Inc., 310 U.S. 534, 543-544 (1940).

does not specify the number. The foregoing sentence from the conference report is also vague in that it is a statement of what <u>will</u> pass muster under the statute; it does not purport to define what <u>will not</u> satisfy the statute. Although the example given in the conference report mentions only two properties, as we read the example, it merely illustrates a contingent exchange arrangement that <u>would</u> qualify for like-kind treatment. It does not purport to restrict to two the maximum number of properties that may be identified. <u>Id</u>. Moreover, it should be noted that the primary concern addressed by Congress in amending section 1031(a) was to prevent long periods of delay between the exchange of properties, as was present in the case of <u>Starker v. United States</u>, 602 F.2d 1341 (9th Cir. 1979) (where the exchange could have occurred up to 5 years after the initial transaction). See H. Conf. Rept. 98-861, <u>supra</u> at 866, 1984-3 C.B. (Vol 2) at 120.

Nonetheless, we do believe that Congress intended that taxpayers identify only a finite number of replacement properties.[3] To construe the statute otherwise, i.e., as

---

[3] We note the following dictionary definitions of the word "limited": "Confined within limits, restricted in extent, number, or duration", Webster's Third New International Dictionary (1993); "Restricted; bounded; prescribed. Confined within positive bounds; restricted in duration, extent, or scope", Black's Law Dictionary (6th ed. 1990); "confined or restricted within certain limits", Webster's II New Riverside University Dictionary (1984). Petitioner's identification of replacement properties was "limited" within the everyday, ordinary meaning of the term. Cf. <u>Malat v. Riddell</u>, 383 U.S.
(continued...)

allowing an unlimited number of replacement properties to be identified, would make the identification requirement meaningless.  The fact that Congress included an identification requirement suggests that an identification of an unlimited number of properties could result in none being identified.

In the instant case, however, we need not, and do not, decide the outer limit of how many replacement properties the statute permits taxpayers to identify.  Petitioner's effort to comply with the statute by identifying 20 specific properties to be received in the exchange appears to have been made in good faith and does not cause an absurd result, given the fact that the statute is silent as to the permissible number and the legislative history is an unreliable indicator of the proper limitation.[4]  Petitioner sought advice and, because the regulations were not published, even in proposed form, at the

---

[3](...continued)
569, 571 (1966).

[4]

This is not to say, however, that the requirements of sec. 1.1031(k)-1(c)(4), Income Tax Regs., T.D. 8346, 1991-1 C.B. 150, 157, generally limiting to three the number of properties that taxpayers are entitled to identify, or any number of properties where their total value does not exceed 200 percent of the fair market value of the properties relinquished, is not a valid exercise of the Commissioner's authority to interpret a statute which is silent on the matter.  As stated above, that regulation is not before us because it is not effective for the year in issue.

time the identification was made,[5] neither petitioner nor his adviser was on notice that the Commissioner would take the position that the number of replacement properties that could be identified pursuant to the statute generally would be limited to three.  Consequently, a trap for unwary taxpayers was set.[6]

We also do not accept respondent's contention that petitioner's identification of replacement properties did not satisfy section 1031(a)(3)(A) because the determination of the particular replacement property or properties to be received was not based on contingencies beyond the control of the parties to the exchange.  As noted above, the legislative history relied on by respondent states:  "It is anticipated that the designation requirement will be satisfied if * * * the particular property to be transferred will be determined by contingencies beyond the control of both parties."  H. Conf. Rept. 98-861, supra at 866, 1984-3 C.B. (Vol. 2) at 120.  As we stated above, we believe that Congress was merely illustrating that a contingent identification

---

[5]

We note that the proposed regulations setting forth the Commissioner's construction of the statute and legislative history were not published until May 16, 1990, after the transactions in issue occurred.  Sec. 1.1031(a)-3, Proposed Income Tax Regs., 55 Fed. Reg. 20282.

[6]

The difficulty taxpayers faced in interpreting the legislative history has been noted by at least one commentator. Wasserman, "Mr. Mogul's Perpetual Search for Tax Deferral: Techniques and Questions Involving Section 1031 Like-Kind Exchanges In a World of Changing Tax Alternatives", 65 Taxes 975, 1000 n.211 (1987).

would satisfy the statutory requirement.  It does not appear to mean, even by implication, that an identification of multiple properties without a contingency would not satisfy the identification requirement.  As with the number of replacement properties that may be identified, we similarly consider the conference report inconclusive as to any contingency requirement. As noted above, the Commissioner did not see fit to adopt such a requirement in the regulations.  We do not believe that our construction of the statute as not imposing a contingency requirement would make the identification requirement meaningless.  Accordingly, we are not persuaded that Congress intended that an identification of replacement properties would satisfy the identification requirement only if the particular property to be received were to be determined by contingencies beyond the control of the parties to an exchange.

Consequently, we conclude that petitioner made a valid identification of replacement properties within the statutorily prescribed period and that Hillview constitutes property of a like kind received in exchange for petitioner's interest in RPDS pursuant to section 1031(a)(3).

Petitioner's exchange of his interest in RPDS for the Sheffield lot, however, does not qualify as a like-kind exchange pursuant to the provisions of section 1031(a)(3).  As noted above, section 1031(a)(3)(B) provides that, in order to be considered like-kind property, replacement property may not be

received after the earlier of (1) 180 days after the transfer of property relinquished in such exchange, or (2) the due date of the return, including extensions, for the year in which the relinquished property is transferred.  Petitioner's return for 1988, the year in which the transfer of his interest in RPDS occurred, was due on April 15, 1989.  That due date was less than 180 days after the transfer of his interest in RPDS, and so it marks the end of the time allowed for completing the exchange of such interest for like-kind property.  Petitioner did not receive the Sheffield lot until May 17, 1989.  Consequently, petitioner failed to complete the exchange of his interest in RPDS for the Sheffield lot within the statutorily prescribed time limit.  Sec. 1031(a)(3)(B)(ii).  Furthermore, respondent contends, and petitioner does not dispute, that the transfer of the Sheffield lot to petitioner occurred 194 days after petitioner transferred his interest in RPDS.[7]  Consequently, the exchange of petitioner's interest in RPDS for the Sheffield lot was not completed within the 180-day period prescribed by section 1031(a)(3)(B)(i).  Accordingly, the Sheffield lot is not property of a like kind received in exchange for petitioner's interest in

---

[7]     Indeed, other than objecting to respondent's proposed ultimate finding of fact that the transaction involving the Sheffield lot was not a qualified exchange under sec. 1031(a), petitioner makes no argument on brief with respect to the Sheffield lot transaction.

RPDS for purposes of the statutory provisions governing deferred like-kind exchanges.  Sec. 1031(a)(3).

In sum, we hold that petitioner must recognize gain realized upon the disposition of his interest in RPDS only with respect to the exchange of his interest in RPDS for the Sheffield lot.

To reflect concessions and the foregoing,

<u>Decision will be entered under Rule 155</u>.