James ALDERSON, surviving husband and Estate of Clarissa E. Alderson, Deceased, James Alderson, Executor, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 18221.

United States Court of Appeals Ninth Circuit.

May 22, 1963.

Paul Frederic Marx, Santa Ana, Cal., and Ernest J. Zack, Los Angeles, Cal., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Alec A. Pandaleon, and Fred E. Youngman, Attys., Dept. of Justice, Washington, D. C., for respondents.

Before BARNES and MERRILL, Circuit Judges, and CRARY, District Judge.

CRARY, District Judge.

Petitioners seek review of the decision of the Tax Court, entered May 8, 1962, determining a deficiency in income tax for the taxable year 1957 in the amount of $39,530.58.

The question presented is whether the transactions whereby taxpayers transferred one parcel of realty and acquired another constituted a sale, the gain from which is recognizable under Section 1002 [1] of the Internal Revenue Code of 1954, or a non-taxable exchange within the meaning of Section 1031 [2] of said Code.

1. "§ 1002. Recognition of gain or loss
"Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized." (26 U.S.C.1958 ed., § 1002.)

2. "§ 1031. Exchange of property held for productive use or investment

"(a) Nonrecognition of gain or loss from exchanges solely in kind.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial

On May 21, 1957, following negotiations between petitioners and Alloy Die Casting Company, hereinafter referred to as Alloy, representatives of petitioners and Alloy executed escrow instructions to the Orange County Title Company, hereinafter referred to as Orange, constituting a purchase and sale agreement whereby petitioners agreed to sell their Buena Park property, consisting of 31.148 acres of agricultural property, to Alloy for $5,550.00 per acre, a total price of $172,871.40. Pursuant to the terms of said agreement, Alloy deposited $17,205.00 in the Orange escrow toward purchase of the Buena Park property.

Some time after the execution of the May 21st escrow petitioners located 115.32 acres of farming land in Monterey County, California, hereinafter referred to as the Salinas property, which they desired to obtain in exchange for their Buena Park property.

On August 19, 1957, petitioners and Alloy executed an amendment to their May 21, 1957, escrow providing that "the Salinas property be acquired by Alloy and exchanged for the Buena Park property in lieu of the original contemplated cash transaction." (R. 21). The amendment further provides that if the exchange was not effected by September 11, 1957, the original escrow re the purchase for cash would be carried out. On the same day (August 19th) petitioners' daughter, Jean Marie Howard, acting for petitioners, executed escrow instructions to the Salinas Title Guarantee Company, hereinafter referred to as Salinas Title, in the form of "Buyer's Instructions." The parties have agreed that the acts of petitioners' daughter, Jean Marie Howard, with respect to the transactions here involved, are to be considered as acts of the petitioners, and any acts of said daughter are hereinafter referred to as acts of petitioners. The escrow instructions last mentioned provided for payment of $190,000.00 for the Salinas property, that title was to be taken in the name of Salinas Title, that $19,000.00 had been deposited with Orange and that the remaining $171,000.00 would also be deposited with Orange. The instructions also stated that Salinas Title was authorized to deed the Salinas property to Alloy, provided Salinas Title could "immediately record a deed from Alloy * * * to James Alderson and Clarissa E. Alderson, his wife, issuing final title evidence in the last mentioned grantees." (R. 21–22, R.Br. 5).

On August 20, 1957, petitioners authorized Orange to pay $19,000.00 into the Salinas escrow, which was done, and directed Orange to pay $171,000.00 into the Salinas escrow when these funds became available. (R. 22).

On August 22, 1957, Alloy, by letter to petitioners, summarized the agreements of the parties *re the manner of accomplishing the transfer of the properties between them.* (R.Br. 6). The letter further stated thaat Alloy's representative would deposit $172,871.40 (the cash amount for the Buena Park property as per May 21st escrow) with Salinas Title on assurance that the agreements would be effected. The letter was countersigned by petitioners.

By deed dated August 20, 1957, title to the Salinas property was transferred to Salinas Title. By deed dated August 21, 1957, Salinas Title conveyed the Salinas property to Alloy. By deed dated August 26, 1957, petitioners conveyed the Buena Park property to Alloy and deed dated August 29, 1957, conveyed the Salinas

interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

"(b) Gain from exchanges not solely in kind.—If an exchange would be within the provisions of subsection (a), of section 1035(a), or of section 1036(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property. * * *" (26 U.S.C.1958 ed., § 1031.)

property from Alloy to petitioners. All four of these deeds were recorded September 4, 1957. (R.Br. 6).

On September 3, 1957, Alloy, acting through its attorney, Elliott H. Pentz, deposited $172,871.40, *belonging to Alloy*, into the Salinas escrow, *on Alloy's behalf*, with instruction that said sum should be used to complete the purchase of the Salinas property. (R. 17, 24, 72–73). The said $172,871.40, plus the $19,000.00 previously deposited with Salinas Title by Orange, made up something more than the $190,000.00 purchase price for the Salinas property, and the excess was returned to the petitioners. Alloy's original deposit of $17,205.00 in the Orange escrow was returned to it sometime after August 28, 1957. (R. 23).

The petitioners paid approximately $10,000.00 into the Orange escrow for real estate commissions and escrow charges and paid for documentary stamps on the transfer of the Buena Park property to Alloy, and $471.80 into the Salinas escrow for fees and escrow charges together with cost of documentary stamps on the transfer of the Salinas property from Salinas Title to Alloy.

Alloy paid $106.38 to Orange for escrow charges and paid nothing to Salinas Title for escrow charges or stamps.

The Commissioner determined that the transfer of the Buena Park property to Alloy constituted a sale upon which petitioners realized a long term capital gain (R. 9) and the Tax Court sustained the decision of the Commissioner (R. 27) holding " * * * that the transactions in which petitioners disposed of the Buena Park property and acquired the Salinas property did not constitute an exchange within the meaning of Section 1031(a)."

In considering the question involved, there are certain findings of the Tax Court which this court believes to be particularly pertinent. Said findings are as follows:

"*From the outset, petitioners desired to exchange their Buena Park property for other property of a like kind. They intended to sell the property for cash only if they were unable to locate a suitable piece of property to take in exchange.*" (R. 20) (Emphasis ours.)

"The deposit by Alloy of $172,871.40 in the Salinas escrow was made by Elliott Pentz, an attorney, pursuant to the commitment of his client, Alloy. The funds were received from Alloy by Pentz; *were the property of Alloy;* and *were deposited by him in Alloy's behalf.*

"*Alloy acquired title to the Salinas property solely to enable it to perform its agreement to exchange that property for the Buena Park property.*" (R. 24) (Emphasis ours.)

"The Buena Park property and the Salinas property were of like kind." (R. 24)

By the findings of the Tax Court, supra, it was determined that there was from the outset no intention on the part of the petitioners to sell the Buena Park property for cash if it could be exchanged for other property of like kind. There is no question that the desired property of like kind was located (Salinas property) and that, as determined by the findings, petitioners had no intention other than to exchange the Buena Park property for the Salinas property. It also follows from the findings that petitioners had no intention to purchase the Salinas property and that title to the Salinas property was to come to the petitioners by exchange thereof for the Buena Park property. The intention of the parties and what actually occurred re the obtaining of the Salinas property for the exchange is further established by the finding that the $172,871.40 deposited by Alloy's attorney, Pentz, in the Salinas escrow was the *"property of Alloy"* and deposited by Pentz *"in Alloy's behalf."* Further, "Alloy acquired title to the Salinas property solely to enable it to perform its agreement to exchange the property for the Buena Park property."

Respondent concedes that an exchange is not vitiated because cash is received in addition to property held for productive

use or investment, but asserts that the $19,000.00 deposited by petitioners with Orange escrow was transmitted by Orange to Salinas escrow, whereas Alloy's initial deposit of $17,205.00 into the Orange escrow was returned by Orange to Alloy, and that if petitioners were not the purchasers of the Salinas property that Orange would have returned the $19,000.-00 to petitioners and deposited the $17,-205.00 with Salinas escrow in payment of the difference between the value of the Buena Park property and the purchase price of the Salinas property.

It is the position of respondent that from the facts and circumstances outlined above it must be concluded the Buena Park property was sold by petitioners to Alloy and the Salinas property was purchased by petitioners, not Alloy. However, it does not appear from the terms of the amended Orange escrow (August 19, 1957) that there was ever any obligation on the part of Alloy to pay cash for the Buena Park property or for the petitioners to receive cash for said property as provided in the May 21, 1957, escrow, by reason of the fact that *prior* to September 11, 1957, Alloy did deposit with Orange a deed to the Salinas property conveying same to petitioners. Neither liability of Alloy to petitioners for payment of cash for the Buena Park property nor liability of petitioners to sell the said property to Alloy for money ever matured because under no conditions was there to be a sale of the Buena Park property for cash until September 11, 1957, and *then only* if the Salinas property *was not* acquired by Alloy and exchanged for the Buena Park property as of that date (R. 21). Deed of Alloy to petitioners conveying the Salinas property and deed of petitioners to Alloy conveying the Buena Park property were exchanged and recorded September 4, 1957. Consequently, an agreement on the part of petitioners to sell to Alloy the Buena Park property for money did not come into being.

Petitioners, on finding the Salinas property, took steps to make it available to Alloy for the exchange by signing buyer's instructions in the escrow of August 19, 1957, opened at Salinas Title, but the fact is, as found by the Tax Court, that petitioners at that time intended to accomplish an exchange of properties and that the Salinas property was "acquired by Alloy" for the sole purpose of such exchange.

True, the intermediate acts of the parties could have hewn closer to and have more precisely depicted the ultimate desired result, but what actually occurred on September 3 or 4, 1957, was an exchange of deeds between petitioners and Alloy which effected an exchange of the Buena Park property for the Salinas property. It is also noted by the court that the buyer's instructions in the Salinas escrow did not conform to the seller's instructions although the transfer from the original owner of the Salinas property to Salinas Title was, as to the provision at variance, pursuant to the terms of the buyer's instructions. If Alloy had signed the said "Buyer's Instructions" this litigation would have been avoided, but even in the circumstances here involved the court concludes that the intended exchange was accomplished.

Respondent argues the Tax Court found only that petitioners from the outset "desired" to exchange their Buena Park property and not that from the outset they "intended" to do so. This would appear in the circumstances to be a distinction without a difference since it does not seem logical that one would intentionally take steps to accomplish a result not desired, and that, therefore, all acts of the petitioners may be considered as having been performed with the intent to accomplish their desired result, to wit, "exchange their Buena Park property for other property of a like kind."

The case of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, is cited by respondent in support of its position. The court, 293 U.S. at page 469 of its opinion, 55 S.Ct. at page 267, states:

"But the question for determination is whether what was done, apart

from the tax motive, was the thing which the statute intended."

In the case at bar, the ultimate objective appears without question to have been the exchange of property of like kind. As the court in the Helvering case further observes:

"Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find?" (293 U.S. page 469, 55 S.Ct. page 267).

In the instant case we find a plan to exchange the properties within the intent of the statute (§ 1031 I.R.C. of 1954), and the acquiring of the Salinas property by Alloy with the sole purpose of trading same for the Buena Park property which does not make the transaction one within Section 1002, Internal Revenue Code of 1954.

It is contended by respondent (R.Br. 15) "that purpose may not be frustrated by refinements of title." Citing Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981. In that case, the court held, 324 U.S. at page 333, 65 S.Ct. at page 708, that "despite the declaration of a 'liquidating dividend' followed by the transfers of legal title, the corporation had not abandoned the sales negotiations; that these were mere formalities designed 'to make the transaction appear to be other than what it was' in order to avoid tax liability." In the present case, it does not appear that there was any intent on the part of the parties to make the transaction appear to be other than what it was, to wit, an exchange of property. There was no attempt or intent to make the transaction appear to be an exchange to cover for an actual sale of the Buena Park property. On page 334 of its opinion, 65 S.Ct. on page 708, the Supreme Court, in the Court holding Co. case, supra, says:

"The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."

This court in Schulz v. Commissioner of Internal Revenue, 294 F.2d 52, states, at page 56 of its opinion:

"The rules enunciated herein, namely, that in proper cases the commissioner can go beyond the formal dealings of the parties to see if these forms reflect meaningful substance—are elementary in the law of taxation and find support in the Supreme Court." Citing the Court Holding case, supra, and the Gregory case, supra.

The Tax Court clearly found in the instant case that "from the outset, petitioners desired to exchange their Buena Park property for other property of a like kind." As held in the cases above cited, "[t]he incidence of taxation depends upon the substance of a transaction" and the transaction must be viewed as a whole and is not finally to be determined solely by the means employed.

Petitioners place strong reliance on the case of Mercantile Trust Company of Baltimore v. Commissioner of Internal Revenue, 32 B.T.A. 82. Respondent observes (R.Br. 21) it is in accord with the petitioners that "the multi-party situation should be governed by the principle enunciated in the Mercantile Trust Co. case, supra." In that case, the taxpayers, owners of Baltimore Street property, agreed with a Title Company to exchange

said property for a certain property on Lexington Street, owned by an estate, plus the sum of $33,000.00 in cash. The agreement also provided that if the Title Company was unable to purchase the Lexington Street property the taxpayer could require the Title Company to pay cash for the Baltimore Street property. (R.Br. 21–22). The Board of Tax Appeals held there had been an exchange of property within the statute. Pertinent to the case at bar, the court, 32 B.T.A. at page 87 of its opinion, states:

"The above-mentioned agreement of March 7 evidenced an intention to exchange the Baltimore Street property, if certain conditions were met, and to sell it, if those conditions were not met. Those conditions were met. The property was, in fact, exchanged. That fact is controlling here."

The title to the Lexington Street property was acquired by the Title Company for the purpose of the exchange, and it follows by analogy that there was no need for Alloy to acquire a "real" interest in the Salinas property by assuming the benefits and burdens of ownership to make the exchange qualify under the statute although respondent asserts that failure of Alloy to hold a "real" interest in the Salinas property precluded the transactions involved from being construed as constituting an exchange.

The Mercantile case appears to hold that one need not assume the benefits and burdens of ownership in property before exchanging it but may properly acquire title *solely for the purpose of exchange* and accept title and transfer it in exchange for other like property, all as a part of the same transaction with no resulting gain which is recognizable under Section 1002 of the Internal Revenue Code of 1954.

Referring again to the Salinas escrow and the instructions to Orange, it is to be noted that the terms of the buyer's instructions in the Salinas escrow and the instructions to Orange were not carried out in important details not heretofore mentioned. Although the petitioners authorized Orange to pay $19,000.00 into the Salinas escrow and to pay $171,000.-00, when available, into the Salinas escrow, and although the Salinas escrow provided for the depositing of $171,000.-00 into the Orange escrow (R.Br. 5), *this was not done.* The $171,000.00 nor any part thereof was ever paid into the Orange escrow, but on the contrary $172,-871.40, *property of Alloy*, was by its attorney, Pentz, deposited in the Salinas escrow *in Alloy's behalf.*

The court concludes the holding of the Tax Court, "that in essence petitioners acquired the Salinas property in a separate transaction; that payment of the $172,871.40, made by Alloy, was a payment made for petitioners" (R. 32), is not supported by the Tax Court's Findings of Fact, Stipulation of Facts or by the evidence in the case when considered in all of its aspects.

The court further concludes that there was no sale by petitioners of the Buena Park property to Alloy, but that the pertinent transactions resulted in an exchange of the Buena Park property for property of like kind to be held either for productive use in trade or for investment, and that by reason thereof there was no gain or loss from said exchange which should be recognized for income tax purposes. For the reasons set forth above, the Decision of the Tax Court of the United States, entered herein May 8, 1962, "That there is a deficiency in the income tax for the taxable year 1957 in the amount of $39,530.58" (R. 33), is reversed.