PHILLIP M. GARCIA AND DEBORAH H. GARCIA, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15771–79.    Filed March 7, 1983.

*Harold O. Adams,* for the petitioners.
*Miles D. Friedman,* for the respondent.

HAMBLEN, *Judge:* Respondent determined a deficiency of $24,830 in petitioners' 1977 Federal income tax. After concessions, the issues for decision are:

(1) Whether petitioners' disposition of one parcel of real property and acquisition of another qualified as a like-kind exchange under section 1031(a).[1]

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue.

(2) If so, whether petitioners must recognize any gain on the exchange under section 1031(b).

FINDINGS OF FACT

All of the facts have been stipulated and are found accordingly.

Petitioners Phillip M. Garcia and Deborah H. Garcia, husband and wife, resided in Long Beach, Calif., when they filed their 1977 joint Federal income tax return with the Internal Revenue Service Center, Fresno, Calif., and when they filed their petition in this case.

As of July 1977 and prior thereto, petitioners owned residential real property located at 163 and 163½ St. Joseph in Long Beach, Calif. (hereinafter referred to as the St. Joseph property), which they held as rental property. In 1977, they decided to dispose of the St. Joseph property and discovered that Nicholas Farnum and Peter O. Philpott (hereinafter referred to as Farnum and Philpott) were interested in purchasing the property. Rather than selling the property to Farnum and Philpott, however, petitioners wanted to effect an exchange of the St. Joseph property for other like-kind property so as to qualify for nonrecognition of gain under section 1031. Since Farnum and Philpott did not own any property petitioners were interested in acquiring, the parties had to locate property for which petitioners would be willing to exchange the St. Joseph property. Consequently, petitioners and Farnum and Philpott established escrow No. 1285-ST with the Transpacific Escrow Corp. (hereinafter referred to as Transpacific). Pursuant to the escrow agreement, petitioners agreed to sell, and Farnum and Philpott agreed to purchase, the St. Joseph property for $140,000. In addition, Farnum and Philpott promised to cooperate with petitioners in structuring a tax-deferred exchange of properties under section 1031. The escrow agreement gave Farnum and Philpott the option to cancel the escrow if a suitable exchange property was not located within 60 days of the date thereof.

Suitable property for the exchange was found at 2042 Pine (hereinafter referred to as the Pine property) in Long Beach, Calif. Such property was residential real property owned by Barton H. Colombi and Hoyte E. Hayden (hereinafter referred to as Colombi and Hayden). To accomplish the petitioners'

exchange of the St. Joseph property for the Pine property, a series of transfers was made through the use of escrow agreements. These transfers involved not only the St. Joseph and Pine properties, but also a third property located in Hollydale, Calif. (hereinafter referred to as the Garfield property), owned by Domino, Eleana, Salvatore J., and Alice E. Grillo (hereinafter referred to as the Grillos). The Garfield property was included in the transaction because Colombi and Hayden wanted to acquire such property.[2]

In addition to escrow No. 1285-ST, two other escrows (escrow No. 1308-ST and escrow No. 1406-ST) were established with Transpacific in order to consummate the transaction. Pursuant to escrow No. 1308-ST, dated August 3, 1977, petitioners agreed to transfer the St. Joseph property to Colombi and Hayden in exchange for the Pine property. Thereunder, petitioners were listed as the buyers, and Colombi and Hayden were listed as the sellers. The escrow agreement stated that the St. Joseph and Pine properties had a value of $140,000 and $143,000, respectively, and were subject to encumbrances of $107,000 and $75,000, respectively.[3] In addition, it provided that, when Colombi and Hayden transferred the Pine property to petitioners, it would be subject to a new deed of trust in the amount of $107,200. Any difference between each party's equity in his respective property prior to closing would be satisfied by a cash payment. The escrow was scheduled to close on or before November 1, 1977. Its closing, however, was made contingent upon the concurrent closing of escrow No. 1285-ST.

With respect to the participation of Colombi and Hayden in the exchange, escrow No. 1308-ST stated as follows:

The Second party [Colombi and Hayden] agrees to enter into this escrow for the purpose of a tax deferred exchange under Section 1031 of the Internal revenue code and for the benefit of the first party [petitioners].

---

[2]Colombi and Hayden were attempting to qualify their disposition of the Pine property and acquisition of the Garfield property as a like-kind exchange under sec. 1031. The applicability of sec. 1031 to their disposition and acquisition of property, however, is not before us in the instant case and is not addressed herein.

[3]Originally, the escrow agreement indicated that the St. Joseph property was subject to encumbrances of only $65,000. Evidently, this error was due to a failure to consider the second mortgage on the property in the amount of $42,000. The escrow agreement was amended to correct this error on Aug. 5, 1977.

The Second party agree [sic] to execute all instructions and documents necessary to close escrow No. 1285 as Seller although all costs that are charged to the second party as seller shall be credited to second party in this escrow No. 1308. It is understood that the second party (Colombi and Hayden) shall be at no additional expense due to the exchange other than normal fees to seller on the second property (2042 Pine).

The first party agrees to pay all fees incurred in the sale of the first property [St. Joseph property].

To comport with the transfer of the St. Joseph property to Colombi and Hayden under escrow No. 1308-ST, escrow No. 1285-ST was amended to substitute Colombi and Hayden for petitioners as the sellers of the St. Joseph property thereunder. The amendment was dated August 5, 1977, and provided as follows:

Due to the exchange escrow No. 1308-ST, it is understood that you will record a grant deed on this subject property from Phillip M. Garcia and Deborah H. Garcia to Barton H. Colombi, a single man and Hayt [sic] Hayden, an unmarried man and the following parties shall be shown as seller of this property:

Barton H. Colombi and Hayt [sic] Hayden

It is understood that Colombi and Hayden shall be at no additional expense as seller of this property and is only to accomodate [sic] the exchange escrow. Any fees shown as a charge in this escrow to Colombi and Hayden shall be credited back to said party in Escrow No. 1308-ST.

Sometime prior to the closing, Colombi and Hayden decided that they wanted to acquire the Garfield property and attempted to structure the acquisition of that property as an exchange of the Pine property for the Garfield property which would qualify for nonrecognition of gain under section 1031. Therefore, pursuant to escrow No. 1406-ST, dated September 17, 1977, Colombi and Hayden agreed to transfer the Pine property and $40,000 in cash to the Grillos in exchange for the Garfield property. The escrow agreement provided that the Pine and Garfield properties would be transferred subject to deeds of trust in the amounts of $107,200 and $78,526, respectively. In addition, the agreement provided that the Garfield property would be transferred subject to a land contract executed by Colombi and Hayden to the Grillos in the amount of $180,000 with an unpaid principal balance of $140,000. The escrow provided that it would close and the properties would be exchanged on or before November 1, 1977.

Its closing, however, was made contingent upon the concurrent closing of escrow No. 1285-ST and escrow No. 1308-ST.

With respect to the exchange of the Pine property for the Garfield property, escrow No. 1406-ST stated as follows:

> The parties are entering into this escrow for the purpose of the second party [Colombi and Hayden] obtaining [the] benefit of Section 1031 of the Internal Revenue Code. Escrow holder is released of all liability of said escrow qualifying for said Section. The Third party [Grillos] agrees to execute all documents pertaining to the Second property [Pine property] which is sold in escrow No. 1308 as the seller of said property and is to be at no additional expense other than the sale of the third property which is 12001 to 12017 Garfield, Hollydale, California.

>      *     *     *     *     *     *     *

> You are instructed to transfer the proceeds due the parties in this escrow to either Escrow No. 1308, 1285 to balance files accordingly.

On the same date that they established escrow No. 1406-ST, September 17, 1977, Colombi and Hayden and the Grillos entered into an installment sale land contract. Thereunder, Colombi and Hayden agreed to pay a purchase price of $180,000 for the Garfield property as follows: $40,000 downpayment and the balance of the purchase price of $140,000, with interest on any unpaid balance at a rate of 9.5 percent per annum, payable in installments of $1,200 per month from December 1, 1977, until November 1, 1992, at which time the principal balance and interest thereon would be due. The Grillos agreed to make the payments on the existing first deed of trust on the property.

On November 1, 1977, all three escrows closed simultaneously and the following grant deeds were recorded:

| Escrow No. | Property | Grantors | Grantees |
|---|---|---|---|
| 1308–ST | St. Joseph | Petitioners | Colombi and Hayden |
| 1285–ST | St. Joseph | Colombi and Hayden | Farnum and Philpott |
| 1308–ST[4] | Pine | Colombi and Hayden | Grillos |
| 1308–ST | Pine | Grillos | Petitioners |

Therefore, once the terms of the escrow agreements were fulfilled, petitioners received title to the Pine property, and Farnum and Philpott received title to the St. Joseph property. When petitioners took title to the Pine property, it was subject

---

[4]Even though the transfer of the Pine property to the Grillos was agreed to under escrow No. 1406–ST, the deed indicates that it was executed pursuant to escrow No. 1308–ST.

to a first deed of trust in the amount of $100,000 and a second deed of trust in the amount of $7,250, for a total of $107,250.[5] Petitioners transferred the St. Joseph property subject to total liabilities in the amount of $106,463.33.[6]

The total purchase price of the St. Joseph property was $140,000. Prior to closing, Farnum and Philpott deposited $32,400 in escrow No. 1285-ST and obtained a $112,000 loan from American Savings & Loan Association, Huntington Beach, Calif.[7] After paying the first and second mortgages on the St. Joseph property, closing costs, and other miscellaneous expenses, the proceeds due to the seller from escrow No. 1285-ST equaled $31,086.43. These proceeds were transferred by a draft from Transpacific dated November 2, 1977, drawn from escrow No. 1285-ST and payable to the order of "Transpacific Escrow Corporation credit Escrow No. 1308-Garcia." A voucher attached to the draft stated only the following: "Transfer of funds to Escrow 1308 for account of Garcia exchange escrow."

On their 1977 return, petitioners reported the following with respect to their disposition of the St. Joseph property:

1. *Potential gain realized*

| | | |
|---|---:|---:|
| Amount received on exchange: | | |
| Value of apartment acquired | $143,000 | |
| Liability against property transferred | 106,463 | $249,463 |
| Less—price paid for exchange: | | |
| Basis of old apartment | 37,333 | |
| Cash paid | [8]4,653 | |
| Debt against property acquired | 107,250 | 149,236 |
| Potential gain realized on exchange | | 100,227 |

---

[5]The Court notes the discrepancy of $50 between the liability amounts of $107,200 (required by the terms of the escrow agreement) and $107,250 (actually acquired) but finds this difference to be immaterial to the legal issues presented here.

[6]At the time of the transfer, the St. Joseph property was subject to a first mortgage of $64,463.33 and a second mortgage of $42,000.

[7]A settlement statement which appears to have been prepared with respect to such loan listed Phillip M. Garcia as the seller.

[8]Prior to the time the escrows closed, petitioners deposited $8,300 in escrow No. 1803–ST. The settlement statement issued by Transpacific with respect to escrow No. 1308–ST indicates that after the payments of various expenses, $4,663.57 of the original $8,300 remains to be distributed to Colombi and Hayden. Consequently, the amount petitioners set forth as "Cash paid" is incorrect and should be $4,663.57.

2. *Gain taxed on exchange*

Amount of boot received:

| | | |
|---|---|---|
| Liability against property transferred | | $106,463 |
| Less boot given: | | |
| Debt on property received | $107,250 | |
| Cash paid | 4,653 | 111,903 |
| Net boot received | | None |
| Amount of gain taxed (equal to boot) | | None |

In the notice of deficiency, respondent determined that petitioners' disposition of the St. Joseph property did not constitute a qualified exchange under section 1031, and, therefore, that the gain realized upon the transfer constituted taxable income. Respondent determined that petitioners realized taxable gain of $101,994 from the transaction as follows:

| | | |
|---|---|---|
| Sales price | | $140,000 |
| Selling expenses | | (673) |
| Amount realized | | 139,327 |
| Basis: Cost | $43,000 | |
| Depreciation taken | 5,667 | (37,333) |
| Gain | | 101,994 |

### OPINION

We must decide whether petitioners' disposition of the St. Joseph property and acquisition of the Pine property constituted an exchange which qualifies for nonrecognition of gain under section 1031.[9]

Petitioners maintain that the substitution of the Pine property for the St. Joseph property constituted a qualified exchange. Respondent asserts that the transactions must be instead classified as an unqualified sale of the St. Joseph property coupled with a reinvestment of the proceeds therefrom in the Pine property. We find that a qualified exchange occurred here.

In making this determination, the steps taken to accomplish

---

[9]Sec. 1031(a) provides: "No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment."

the end result must be considered as well as the result itself. The substance of the transaction, rather than its form, must govern the tax consequences. See *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Gregory v. Helvering*, 293 U.S. 465 (1935); *Biggs v. Commissioner*, 69 T.C. 905 (1978), affd. 632 F.2d 1171 (5th Cir. 1980); *Barker v. Commissioner*, 74 T.C. 555 (1980).

The parties' intent often has been considered in evaluating the true substance of a purported exchange transaction. Intent alone does not determine tax consequences, and the bare fact that a taxpayer desires to fall within a particular section of the Internal Revenue Code is not controlling where actions belie expressed intent. See *Smith v. Commissioner*, 537 F.2d 972 (8th Cir. 1976); *Carlton v. United States*, 385 F.2d 238 (5th Cir. 1967). Nonetheless, stated intent has received deference where parties have acted consistently therewith. The possibility that intent may be thwarted has not deterred a finding of section 1031 application where, in fact, such possibility did not materialize and an exchange actually occurred.

Thus, in *Mercantile Trust Co. of Baltimore v. Commissioner*, 32 B.T.A. 82 (1935), a qualified exchange was found despite a taxpayer's retention of the right to require cash payment if the other party to the exchange was unable to acquire for exchange an identified property desired by the taxpayer. The Board did not deem the possibility of a sale fatal to a finding of an exchange where the conditions required to animate an intent to exchange had been met. The Board stated:

The * * * agreement * * * evidenced an intention to exchange the [taxpayer's] property, if certain conditions were met, and to sell it, if those conditions were not met. Those conditions were met. The property was, in fact, exchanged. That fact is controlling here. * * * [32 B.T.A. at 87.]

Cases decided since *Mercantile Trust Co. of Baltimore* have followed the pattern of ignoring alternative sales possibilities where a preference for exchange was manifest and exchange actually occurred. E.g., *Starker v. United States*, 602 F.2d 1341 (9th Cir. 1979); *Smith v. Commissioner, supra*; *Coastal Terminals, Inc. v. United States*, 320 F.2d 333 (4th Cir. 1963); *Carlton v. United States, supra* (*agreement with principle, although result to contrary due to form of payment*).

In *Starker v. United States, supra*, a taxpayer exchanged property for an "exchange balance" to be used by the

transferee subsequently to purchase suitable exchange property. Although the replacement property was unidentified at the time of the exchange, the exchange period was to continue for 5 years, and any balance not used by the transferee to purchase exchange property was to be refunded to the taxpayer in cash at the end of the 5-year period, the Court held that section 1031 applied. The *Starker* opinion offers this clear statement of the persuasiveness of intent coupled with actual exchange:

Even if the contract right includes the possibility of the taxpayer receiving something other than ownership of like-kind property, we hold that it is still of a like kind with ownership for tax purposes when the taxpayer prefers property to cash before and throughout the executory period, and only like-kind property is ultimately received. [602 F.2d at 1355.]

The facts of the instant case fit squarely within this expression of a qualified exchange. Both "before and throughout the executory period," the petitioners "preferred property to cash." This is clear from the language of the original escrow agreement for the sale of the St. Joseph property which contained the provision that "Buyer[s] [were] to cooperate with seller[s] for a tax deferred exchange under Section 1031 of the Internal Revenue Code." The location of the Pine property and the entry by the petitioners into the subsequent escrow agreement, which required the conveyance of this property to them, were consistent with their expressed intent.

However, notwithstanding petitioners' intent, the second clause of the *Starker* standard, i.e., that "only like-kind property is ultimately received," is in dispute. Respondent argues that, in addition to the Pine property, cash has been received by the petitioners due to Farnum and Philpott's deposit into escrow No. 1285-ST of $32,400 in earnest money and that these funds, $31,086.43 of which was transferred by the escrow agent to the petitioners' account in exchange escrow No. 1308-ST, were constructively received by the petitioners.

We do not agree. Under the applicable regulation, the doctrine of constructive receipt requires that, although not actually received, income is treated for tax purposes as if received as soon as it is "credited to [taxpayer's] account, set apart for him, or otherwise made available." Sec. 1.451–2(a), Income Tax Regs. The regulation goes on to provide: "How-

ever, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions." In the instant case, we find that substantial restrictions prevented petitioners' ability to control the funds which Farnum and Philpott had deposited into escrow No. 1285-ST. Most importantly, the original escrow agreement required Farnum and Philpott's cooperation in the location and obtaining of suitable exchange property. If such property were not located within 60 days from the execution of the agreement, Farnum and Philpott (but *not* petitioners) had the option of canceling the escrow. Had cancellation occurred, the earnest money deposited by the buyers would have been returned to them. Thus, until such time as the Pine property was located and a contract for its ultimate transfer to the petitioners was formed, neither the petitioners nor any other party to the various exchanges had any right to withdraw or apply the escrowed funds.

As of August 5, 1977, Colombi and Hayden had been substituted as sellers under escrow No. 1285-ST, and petitioners had entered into exchange escrow No. 1308-ST. Thereafter, petitioners could not have had control over the escrowed funds because they were no longer parties to the contract for the sale of the St. Joseph property and had obligated themselves to acquire the Pine property. The fact that the transfer of funds from escrow No. 1285-ST to escrow No. 1308-ST did not occur until after all property transfers had been completed, further negates respondent's contention that petitioners constructively received funds from the sale of the St. Joseph property and then used those funds to purchase the Pine property.

Respondent has argued that Colombi and Hayden were not the actual sellers of the property, but merely acted in a limited capacity as agents for the petitioners. We believe otherwise and find that Colombi and Hayden were the actual transferors of the St. Joseph property under the amended escrow agreement No. 1285-ST. The fact that Colombi and Hayden may have assumed title to the St. Joseph property for the purpose of accommodating the petitioners in accomplishing their desired exchange does not defeat the validity of their ownership. An examination of the relevant documents reveals that Colombi and Hayden had assumed contractual obligations in their own behalves and were not functioning as mere "straw

men" in acting for the petitioners. The acceptability of such title in multiparty situations has been specifically sanctioned. In *Alderson v. Commissioner*, 317 F.2d 790 (9th Cir. 1963), revg. 38 T.C. 215 (1962), the Ninth Circuit noted that:

One need not assume the benefits and burdens of ownership in property before exchanging it but may properly acquire title *solely for the purpose of exchange* and accept title and transfer it in exchange for other like property * * * [317 F.2d at 795; emphasis in original.]

Respondent cites the cases of *Carlton v. United States, supra,* and *Swaim v. United States,* 651 F.2d 1066 (5th Cir. 1981), in support of his contention that a taxable purchase and sale has occurred when there has been "even a momentary cashing-in on one's investment." (Respondent's Reply Brief at 4.) While we do not take issue with this proposition and its conformity with the legislative purpose behind the enactment of section 1031, it is inapplicable where, as here, there is no constructive receipt of proceeds and no "cashing-in" of the petitioners' investment. In this regard, the cases cited by respondent are distinguishable from the case before us.

We reject, also, respondent's contention that "no document referenced a required purpose for * * * [the] earnest money deposited into escrow 1285-ST." (Respondent's Brief at 20.) Under the terms of that agreement, any proceeds from the "sale" of that property were to be used to acquire like-kind property for the petitioners. The fact that the particular property to be acquired in exchange was not identified at the time of entry into escrow No. 1285-ST does not negate this designated purpose. See *Alderson v. Commissioner, supra; Starker v. United States, supra.* Furthermore, the agreements relating to the transfers of the Pine and Garfield properties directly connect the transactions in that these agreements were expressly subject to the closing of the escrow for the transfer of the St. Joseph property. The closing of escrow No. 1308-ST was specifically conditioned upon the closing of escrow No. 1285-ST; escrow No. 1406-ST, in turn, was conditioned upon the simultaneous closing of both escrow No. 1308-ST and escrow No. 1285-ST. Furthermore, since Colombi and Hayden were the transferors of the St. Joseph property under amended escrow No. 1285-ST, until escrow No. 1308-ST closed and Colombi and Hayden received the St. Joseph property pursuant thereto, escrow No. 1285-ST would not close.

Contractual interdependence, in a technical sense, is not prerequisite to a finding of an exchange. Although the presence of direct dependence is convincing (*Barker v. Commissioner, supra; Brauer v. Commissioner,* 74 T.C. 1134 (1980)), an exchange may still be demonstrated in its absence. In making such a demonstration, the "step-transaction" doctrine developed in other areas of tax law has been adopted. See *Minnesota Tea Co. v. Helvering,* 302 U.S. 609 (1938); *Redwing Carriers, Inc. v. Tomlinson,* 399 F.2d 652 (5th Cir. 1968). As the respondent has previously noted:

> The Courts have repeatedly held that where a sale is part of a transaction the purpose of which is to effectuate an exchange, and whereby an exchange has resulted, the transaction is an exchange for tax purposes and the sale is to be disregarded. * * *
>
>    *      *      *      *      *      *      *
>
> In determining the substance of a transaction, the situation as it existed in the beginning and at the end of a series of steps and the object sought to be accomplished should be considered. In the instant case, since the sale was only a necessary step in reaching the ultimate desired exchange, the transaction was an exchange within the provisions of section 1031 of the Code. * * * [Rev. Rul. 57–469, 1957–2 C.B. 521, 522.]

The infusion of the "step-transaction" doctrine into the realm of section 1031 was clear in *Biggs v. Commissioner, supra,* which set forth the standard of the "integrated plan" in determining whether a qualified exchange had occurred. The facts in *Biggs* were similar to the facts now before us in that a complicated series of steps was taken to effect the exchange of a taxpayer's property for like-kind property owned by a party other than the transferee of the taxpayer's original property. While noting that the exchange "could have been more artfully accomplished and with a greater economy of steps" (632 F.2d at 1178), the Fifth Circuit embraced the integrated plan standard and affirmed our determination that a qualified exchange had been accomplished.

Of course, consistent with the notion that intent and result are not alone determinative of the borders of section 1031, a *Biggs* integration will not be found in every instance wherein a taxpayer replaces property with like-kind property while

expressing a preference for nonrecognition treatment over the payment of income tax.[10] In the case before us, however, we find that the interrelations between the various property transfers were integrated in the sense contemplated in *Biggs*. The petitioners desired to effect a section 1031 exchange, their actions were consistent with that expressed intent, the conditions required to effect that intent were met, the contracts providing for the necessary series of transfers were interdependent, no cash proceeds from the sale of the original property were actually or constructively received by the petitioners, and, when the dust had settled, we are persuaded that an integrated plan for an exchange of like-kind property was conceived and implemented.

For the reasons stated above, we hold that the Garcias' exchange of the St. Joseph property for the Pine property was a qualified exchange under section 1031(a).

Having decided the central issue of the applicability of section 1031(a) for the petitioners, we now confront the corollary question of whether the provisions of section 1031(b) and (d) apply to create any exception to the general nonrecognition afforded by section 1031(a). Section 1031(b)[11] requires that, despite the nontaxable status of a like-kind exchange, gain must be recognized to the extent that money or other unqualified property (commonly referred to as boot) is received in addition to qualified like-kind property. Under the basic refinements mandated by section 1031(d),[12] relief from liability is considered as money received for purposes of determining

---

[10]For example, in our recent decision in *Allen v. Commissioner*, T.C. Memo. 1982–188, a taxable sale was found where, despite the fact that two escrows actually closed concurrently, under the applicable agreements, the closing of either escrow was not contingent upon the closing of the other. Therefore, we concluded that the sale of petitioner's property could have been accomplished without the simultaneous acquisition of like-kind property. Thus, the transactions were related only in that petitioner used the proceeds from the sale of one property to purchase another of like kind. This situation is distinguishable from the instant case because, under the facts herein, the closing of each escrow was contingent upon the closing of the other escrows.

[11]Sec. 1031(b) provides: "If an exchange would be within the provisions of subsection (a) * * * [or other nonrecognition provisions], if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."

[12]Sec. 1031(d) provides in relevant part: "Where as part of the consideration to the taxpayer another party to the exchange assumed a liability of the taxpayer or acquired from

boot. These "mortgage-boot" rules of section 1031(b) and (d) combine to require under certain conditions that the assumption or acquisition of a transferor's mortgage liability by a transferee results in taxable boot to the transferor.

However, the mortgage-boot rule applies only where a transferor is relieved of liabilities without a corresponding assumption of liabilities from the transferee. Where liabilities are relieved and assumed on both sides of an exchange, they are netted against each other in determining the extent, if any, to which taxable boot has been received. This liability offset provision is logically required to uphold the purpose of section 1031 in deferring recognition of theoretical gains or losses and is embodied in section 1.1031(b)-1(c), Income Tax Regs., which provides in relevant part:

Where, on an exchange described in section 1031(b), each party to the exchange either assumes a liability of the other party or acquires property subject to a liability, then, in determining the amount of "other property or money" for purposes of section 1031(b), consideration given in the form of an assumption of liabilities (or a receipt of property subject to a liability) shall be offset against consideration received in the form of an assumption of liabilities (or a transfer subject to a liability). * * *

Under the language of this regulation, petitioners are clearly entitled to offset the amount of their relieved liabilities by the amount of their assumed liabilities. It is undisputed that the St. Joseph property was encumbered throughout the relevant transactions with a mortgage of $106,463, and that the transfer of this property resulted in the relief of liabilities of $106,463 for the petitioners. However, the proper figure to be used to offset this $106,463 is in dispute. Petitioners claim they are entitled to use $107,250 as an offset figure, resulting in no taxable gain, while respondent claims that only $75,000 is eligible to offset, resulting in a taxable boot gain of $23,163, that being the difference between $106,463 and $75,000, further reduced by $8,300 cash which the petitioners had deposited into the escrow for the purchase of the Pine property. The varying amounts of $107,250 and $75,000 are drawn from the amounts of the mortgages with which the Pine property was encumbered at various times during the ex-

the taxpayer property subject to a liability, such assumption or acquisition (in the amount of the liability) shall be considered as money received by the taxpayer on the exchange."

change procedures. Before entry into the exchange escrow, Colombi and Hayden held the Pine property subject to a mortgage of only $75,000. However, as a precondition to the exchange with the petitioners, Colombi and Hayden were required by the escrow agreement to obtain a "new deed of trust to record in amount of $107,200 at best terms available." They did, in fact, do so, securing a new first deed of trust in the amount of $100,000 and a second trust deed for the additional amount of $7,250. When the petitioners ultimately received the Pine property from Colombi and Hayden by way of the Grillos, they assumed all then-outstanding liabilities thereon totaling $107,250.

Respondent asserts that the $107,250 figure cannot be respected for tax purposes, arguing that it results from an artificial attempt to reallocate liabilities for the purpose of tax avoidance. In so arguing, respondent relied primarily upon this Court's recent decision in *Long v. Commissioner*, 77 T.C. 1045 (1981), and the cases cited therein. Respondent is correct that, in the *Long* case, we stated:

> In considering the validity of any adjustment agreed to by the parties so close in time to the date of the exchange, the documents and the transaction as a whole should be carefully scrutinized to make sure that the form accurately reflects the substance. The form will not be permitted to control over the substance where the form was chosen merely to alter the tax liabilities of the parties * * * [77 T.C. at 1077.]

Respondent has failed, however, to understand properly the context in which that statement was made. The central issue in the relevant aspect of *Long* concerned not merely section 1031(b) standing alone, but rather its interplay with applicable Code provisions under subchapter K, relating to the taxation of partners and partnerships. 77 T.C. at 1078. *Long* involved a reallocation of existing liabilities among partners rather than an assumption of new liabilities in connection with an exchange. The "adjustment" requiring "scrutiny" in the *Long* case was a reallocation of liabilities among partners which was found by the Court to be lacking in economic substance and undertaken solely for tax-avoidance purposes. 77 T.C. at 1080.

In the instant case, we have a situation where, as far as petitioners are concerned, there was an assumption of a debt which had independent economic substance. The fact that the debt was created at petitioners' instance is beside the point. Cf.

*Carlton v. United States, supra* at 243; *Halpern v. United States*, 286 F. Supp. 255, 257 (N.D. Ga. 1968). See also *Commissioner v. Duberstein*, 363 U.S. 278, 286 (1960). We hold that since the amount of liabilities assumed, $107,250, exceeds the amount of liabilities from which petitioners were relieved, $106,463, there was no "boot" and therefore no taxable gain under section 1031(b).

We have considered the respondent's other arguments and find them unpersuasive.

*Decision will be entered for the petitioners.*