T.C. Memo. 1996-214

UNITED STATES TAX COURT

MICHAEL HILLYER AND TERESA HILLYER, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 22118-94, 22119-94      Filed May 2, 1996.
            22120-94, 22121-94.

<u>Edward F. Sutkowski</u>, for petitioners.

<u>Darrell Weaver</u>, for respondent.

MEMORANDUM OPINION

KÖRNER, <u>Judge</u>:  Pursuant to respondent's motion, granted on
August 9, 1995, the above dockets were consolidated in this Court
for trial, briefing, and opinion.  The cases were thereafter

---

[1] Cases of the following petitioners are consolidated
herewith:  David D. Hillyer and Linda J. Hillyer, docket No.
22119-94; William H. Hillyer, Jr., and Kim Rae Hillyer, docket
No. 22120-94; and William H. Hillyer, Sr., and Elizabeth Hillyer,
docket No. 22121-94.

submitted to the Court on a full stipulation of facts and exhibits without trial, pursuant to Rule 122. All statutory references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

On September 2, 1994, respondent determined deficiencies in petitioners' 1991 Federal income taxes in the following amounts:

| Petitioners | Docket No. | Deficiency |
|---|---|---|
| Michael & Teresa Hillyer | 22118-94 | $13,798 |
| David D. & Linda J. Hillyer | 22119-94 | 13,576 |
| William H., Jr., & Kim Rae Hillyer | 22120-94 | 12,724 |
| William H., Sr., & Elizabeth Hillyer | 22121-94 | 44,077 |

All the above petitioners, husbands and wives, filed joint income tax returns for the year 1991 at Kansas City, Missouri, and, at the time of filing the petitions herein, all such petitioners were residents of Illinois. All the male petitioners (petitioners) herein were stockholders of Hillyer Excavating Service, Inc. (the corporation), whose name was changed to Hillyer, Inc., in 1992.

During the 1991 calendar year, the shares of the corporation were owned as follows:

| | Percent |
|---|---|
| Michael Hillyer | 15.44 |
| David D. Hillyer | 15.47 |
| William Hillyer, Jr. | 15.47 |
| William Hillyer, Sr. | 53.59 |
| Total | 100 |

For the year 1991, the corporation filed Form 1120-S as an S corporation, and attributed its net income to petitioners in

ratable shares as the shareholders of the corporation, pursuant to section 1366.[2]

Upon examination of the S return, respondent determined that the income shown by petitioners resulting from the sale of certain property by the corporation was not correctly reported in the corporation's S return nor by petitioners, and the above notices of deficiency resulted.

The issues that the Court must decide are:

(1) Whether the corporation's transfer of land to Penn-Daniels, Inc., and its subsequent acquisition of land from Scott Coggeshall and the Coggeshall Construction Co. (Coggeshall property), and land from Marcellene J. Inness was an exchange of like-kind property within the meaning of section 1031(a); and

(2) whether petitioners correctly computed and reported the gain resulting from these transactions.

The corporation's place of business was at Macomb (McDonough County), Illinois. The corporation had been engaged in the general construction business in that vicinity since 1966. The Coggeshall Construction Co. (the Coggeshall Co.) and its predecessor had been engaged in the general construction business, including road building, in this same area since 1952. The corporation has acted as subcontractor with respect to

---

[2] The parties agree that any gain to be recognized as a consequence of the within transactions must be recognized by the shareholders of the corporation, petitioners in these cases.

construction contracts entered into by the Coggeshall Co. from time to time in the past. In late 1988 or early 1989, the corporation determined that concrete and asphalt work would constitute a natural extension of the corporation's existing construction activities, and principals of the corporation and the Coggeshall Co. in 1989 discussed the idea of the corporation's acquiring an interest in certain property on Deere Road, Macomb, Illinois, which was industrial property owned by Scott Coggeshall, on which the Coggeshall Co. owned an asphalt plant. In addition, the Coggeshall Co. owned other equipment on property owned by J. W. Collins, also located in Macomb, Illinois. The equipment in these two properties was owned by the Coggeshall Co. in connection with its construction and related activities (the whole (land and equipment) is referred to as the Coggeshall property).

In May 1989, and again in January 1991, the corporation sought to lease the Coggeshall property from the owners. Both offers were rejected. Between November 1990 and February 1991, there were also negotiations for the purchase of the Coggeshall property by the corporation. In September 1989, Scott Coggeshall and the Coggeshall Co. entered into a management agreement with and option to sell the Coggeshall property to the Chester Bross Construction Co. (Bross) for a period ending October 1, 1990, which agreement was extended by the parties until November 1, 1991. Because of the failure by Bross to pay equipment rental,

utilities, and taxes, the property was repossessed by Scott Coggeshall and the Coggeshall Co. on January 7, 1992. The Bross agreement expired on November 1, 1991.

On September 21, 1990, the corporation entered into a contract to purchase 9.53 acres of real estate (Phoenix property), which was zoned industrial and was located next to the corporation's offices and shop in Macomb, Illinois. The Phoenix property was purchased and held for productive use in the corporation's trade or business or for investment in connection with its construction activities. The purchase price of the property was $105,000. On August 9, 1991, the adjusted basis of the Phoenix property in the hands of the corporation was $57,085.

Penn-Daniels, Inc., is a Delaware corporation authorized to do business in Illinois. It operates a chain of retail stores. Around 1990, Penn-Daniels developed an interest in acquiring property in Macomb, Illinois, as the prospective location for a new store. It engaged the services of EST Acquisitions, Inc. (EST), to act as its agent in locating and securing a store site in Macomb. In January 1991, the corporation and EST entered into a real estate purchase agreement, as amended, for the sale of the Phoenix property by the corporation to Penn-Daniels for $382,000. Said purchase agreement, assigned by EST to Penn-Daniels, provided that the corporation, as seller, might choose to designate certain properties, allegedly for purposes of achieving a tax-free exchange under section 1031, and Penn-Daniels, as

buyer, agreed to participate in such exchange, provided that the corporation, as seller, would reimburse the buyer for all expenses associated therewith, that the buyer would not actually take title to any such designated exchange property, and that the buyer would not be exposed to any liability as the result thereof. The parties to the agreement understood that the obligation of Penn-Daniels as buyer to participate in any such designated exchange would terminate upon the closing of the sale.

Closing of the sale of the Phoenix property was held on August 9, 1991. The corporation received at settlement the closing amount of $354,065.21 and tendered the appropriate deed to Penn-Daniels for the Phoenix property. With reference to the prior agreement between the corporation and Penn-Daniels, as amended, the corporation thereupon placed the settlement funds it had received with the Citizens National Bank of Macomb as agent under an escrow agreement, under which the corporation reserved the right to designate certain replacement properties. In significant part, the escrow agreement provided that the bank would hold the sales proceeds for the direction of the corporation in the acquisition of replacement properties for the period of 180 days. The corporation was obligated to "direct" the acquisition of such properties within 45 days of the deposit of the money with the bank. No affirmative acts were required from Penn-Daniels, as buyer of the Phoenix properties (except to cooperate (prior to the Phoenix settlement) in the acquisition of

desired replacement properties); in fact none were asked, and none were performed.

On September 20, 1991, the corporation notified the Citizens National Bank, as escrow agent, of the designation of three properties which the corporation intended as replacement properties for the purposes of section 1031(a)(3). These properties were designated as the "McClure quarries in Tennessee Township, Colchester, Illinois," which were not acquired by the corporation; the Coggeshall property; and "property zoned M-2 located south and east of Route 41 in Galesburg Township, Knox County, Illinois" (owner and size not specified).

On January 30, 1992, the corporation, Scott Coggeshall, and the Coggeshall Co. executed a purchase agreement (Coggeshall purchase agreement) with respect to the Coggeshall property for a total purchase price of $577,370, including $321,000 for the real estate owned by Scott Coggeshall and the asphalt plant located thereon owned by the Coggeshall Co. and $256,370 for other miscellaneous equipment, including the asphalt plant owned by the Coggeshall Co., but located on land owned by Collins. Payment for this purchase was accomplished by an immediate payment of $300,000 at closing to the sellers, as a downpayment, with the $277,370 balance to be payable over 4 years. This arrangement for deferred payment was solemnized by a second escrow agreement established by the parties with the Citizens National Bank of Macomb. The Coggeshall property was to be held by the

corporation as investment property or for use by the corporation in connection with its trade or business. The Coggeshall property on Deere Road is of like-kind with that of the Phoenix property. Respondent does not contend that the items detailed in the stipulation with respect to the Deere Road asphalt site in the Coggeshall property should not be considered real property, and has conceded on brief that such items are to be considered real estate.

On March 30, 1992, however, the Coggeshall Co. determined that the Coggeshall Co. could not transfer the plant equipment on the Collins site by reason of a landlord's lien asserted by J. W. Collins; such equipment located on the Collins' property, as stipulated by the parties, was accordingly eliminated from the contract, and the purchase price of the Coggeshall property was accordingly reduced from $577,370 to $510,007.

On January 30, 1992, apparently independently of the Coggeshall purchase, the corporation and Marcellene J. Inness entered into a contract for the sale to it of certain property for $46,361. The transaction closed the same day, on January 30, 1992, with the payment of this sum to the direction of Marcellene J. Inness from the "escrow" account at the Citizens National Bank of Macomb, taken from the funds entrusted to it by the corporation, to be disbursed at its direction, and the Inness warranty deed to the corporation was recorded. The warranty deed

to the property that was recorded describes the property in question as--

> That portion of the West Half of the Southwest Quarter of Section 21, Township 11 North, Range 1 East of the Fourth Principal Meridian, Knox County, Illinois, which is Lot 1 of the Hillyers Excavating Subdivision, as per plat dated December 20, 1991, by Paul M. Willi, Illinois Professional Land Surveyor * * *.

All of the property in section 21, Galesburg Township, is zoned M-2, and this is also true of some portions of other sections of land located south and east of Route 41 in Galesburg Township. The size of the realty conveyed is not given, but this Court takes judicial notice that a section of land is 1 square mile or 640 acres.

The proceeds of the Phoenix property sale settlement of August 9, 1991, which had been retained by the Citizens National Bank under the existing escrow agreement, were disbursed as follows:

| | | |
|---|---|---|
| 1-30-92[3] | $300,000.00 | Downpayment on Coggeshall purchase |
| 1-30-92[3] | 42,174.25 | First Illini Bank escrow (Inness property purchase) |
| 1-30-92[3] | 4,189.75 | First Illini Bank escrow (Inness property purchase) |
| 1-30-92[3] | 53.00 | Recording fees |

---

[3] The dates given in the stipulation herein show an obvious typographical error, principally as to the year of the disbursements. They have been corrected to conform to the dates of the property settlements. Note that the final disbursement by the bank was just 2 days prior to the expiration of the specified 180-day holding period by the bank under the escrow agreement.

2-7-92        7,651.21    Cash balance to corporation

In these cases, we are met again with the tension between section 1001(c), which broadly provides on the one hand that in the case of a sale, the amount of gain or loss shall be recognized, and, on the other hand, the requirement of section 1031(a), which allows for the nonrecognition of gain or loss where like-kind properties are exchanged to be used in a productive trade or business or for investment. The touchstone of section 1031, at least in this context, is the requirement that there be an exchange of like-kind business or investment properties, as distinguished from a cash sale of property by the taxpayer and a reinvestment of the proceeds in other property. As this Court said in Barker v. Commissioner, 74 T.C. 555, 561 (1980):

> The "exchange" requirement poses an analytical problem because it runs headlong into the familiar tax law maxim that the substance of a transaction controls over form. In a sense, the substance of a transaction in which the taxpayer sells property and immediately reinvests the proceeds in like-kind property is not much different from the substance of a transaction in which two parcels are exchanged without cash. Bell Lines, Inc. v. United States, 480 F.2d 710, 711 (4th Cir. 1973). Yet, if the exchange requirement is to have any significance at all, the perhaps formalistic difference between the two types of transactions must, at least on occasion, engender different results. Accord, Starker v. United States, 602 F.2d 1341, 1352 (9th Cir. 1979).

> The line between an exchange on the one hand and a nonqualifying sale and reinvestment on the other becomes even less distinct when the person who owns the property sought by the taxpayer is not the same person who wants to acquire the taxpayer's property. This

means that multiple parties must be involved in the transaction.   * * *

As a result, courts have acknowledged that transactions that take the form of a cash sale and reinvestment cannot, in substance, constitute an exchange for purposes of section 1031, even though the end result is the same as a reciprocal exchange of properties.  <u>Bell Lines, Inc. v. United States</u>, 480 F.2d 710, 714 (4th Cir. 1973); <u>Carlton v. United States</u>, 385 F.2d 238, 241 (5th Cir. 1967).  Thus, our inquiry is narrowly focused on whether the corporation's disposition of the Phoenix property in this case was a sale, as argued by respondent, or an exchange for the Coggeshall and Inness properties, as argued by petitioners.

Petitioners contend that the series of transactions here culminating in the acquisition of the Coggeshall property and the Inness property with funds resulting from the Phoenix property transfer, were steps in an integrated transaction, the substance of which was an exchange of properties within section 1031(a).

In some multiparty transactions, the taxpayer desires to exchange, rather than to sell, his property, but the potential buyer owns no property that the taxpayer wishes to receive in exchange.  Thus, some cases involve three or more parties and multiple conveyances of property in an effort to structure an exchange instead of a sale and reinvestment.  In some of them, these multiparty transactions have been held to constitute an exchange within the meaning of section 1031.  In so holding, the courts have allowed taxpayers great latitude in structuring their

transactions and have allowed nonsimultaneous exchanges, see Starker v. United States, 602 F.2d 1341 (9th Cir. 1979); deposit of proceeds into a bank account controlled by an independent third party before an exchange property is located, J.H. Baird Publishing Co. v. Commissioner, 39 T.C. 608 (1962); transactions in which the intermediary did not acquire legal title to the exchange property, Biggs v. Commissioner, 69 T.C. 905, affd. 632 F.2d 1171 (5th Cir. 1980); and change from a sale transaction to an exchange transaction even though the property to be received on the exchange was not identified as of the date the original agreement was made, Alderson v. Commissioner, 317 F.2d 790 (9th Cir. 1963), revg. 38 T.C. 215 (1962).

These multiparty cases have explained that section 1031 "only requires that as the end result of an agreement, property be received as consideration for property transferred by the taxpayer without his receipt of, or control over, cash". Coupe v. Commissioner, 52 T.C. 394, 409 (1969).

On the other hand, receipt of or control over cash proceeds by a taxpayer will prevent characterization of a multiparty transaction as an exchange. In the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 77(a), 98 Stat. 596, an attempt was made to clarify some of the uncertainties that exist in this area by the enactment of a new section 1031(a)(3), which provides:

> For purposes of this subsection, any property received by the taxpayer shall be treated as property which is not like-kind property if--

(A) such property is not identified as property to be received in the exchange on or before the day which is 45 days after the date on which the taxpayer transfers the property relinquished in the exchange, or

(B) such property is received after the earlier of--

(i) the day which is 180 days after the date on which the taxpayer transfers the property relinquished in the exchange, or

(ii) the due date (determined with regard to extension) for the transferor's return of the tax imposed by this chapter for the taxable year in which the transfer of the relinquished property occurs.

Further attempting to clarify the new statutory provisions under section 1031, section 1.1031(k)-1, Income Tax Regs., effective on or after June 10, 1991, provides in section 1.1031(k)-1(c)(3), Income Tax Regs.:

Replacement property is identified only if it is unambiguously described in the written document or agreement.  Real property generally is unambiguously described if it is described by a legal description, street address, or distinguishable name * * *

Section 1.1031(k)-1(c)(4), Income Tax Regs., further provides that the number of replacement properties that will qualify under section 1031(a) to be designated by the taxpayer may not exceed three in number.

Once again, the new regulations, in section 1.1031(k)-1(f), Income Tax Regs., reemphasize:

A transfer of relinquished property in a deferred exchange is not within the provisions of section 1031(a) if, as part of the consideration, the taxpayer receives money or other property.  * * *

> * * * The taxpayer is in actual receipt of money
> or property at the time the taxpayer actually receives
> the money or property or receives the economic benefit
> of the money or property.  * * *

Finally, in section 1.1031(k)-1(g)(3), Income Tax Regs., the new regulations provide that in the case of an exchange in a deferred plan, the exchange will be recognized under section 1031(a) without regard to the receipt of cash if the cash is held in a qualified escrow account, which is defined as one where (a) the escrow holder is not the taxpayer or a disqualified person, and (b) the escrow agreement expressly limits the taxpayer's rights to receive the cash held in the escrow account.

With these new statutory and regulatory requirements in mind, and recalling that the transfer of the Phoenix property by the corporation took place in August 1991, and the Coggeshall and Inness properties were acquired by it on January 30, 1992, we address the situation in these cases.

The facts show that the designation by the corporation of the intended replacement properties took place on September 20, 1991, which was within the 45 days required under the language of section 1031(a)(3)(A).  Both the Coggeshall and Inness properties were received by the corporation on January 30, 1992, within 180 days after the date of the disposition of the Phoenix properties to Penn-Daniels on August 9, 1991, as required by section 1031(a)(3)(B).  Only three replacement properties were designated.

Nevertheless, an examination of the facts in this record leads us to conclude that the disposition of the Phoenix property in August 1991 and the acquisition of the Coggeshall and Inness properties in 1992 do not qualify for nontaxable treatment under section 1031(a), because although the alleged escrow agreement with the Citizens National Bank was not with the corporation or a disqualified person, as described in section 1.1031(k)-1(g)(3)(ii)(A), Income Tax Regs., nevertheless the escrow agreement did not expressly limit the corporation's right to receive or use the cash held in the escrow account, as specified by section 1.1031(k)-1(g)(3)(ii)(B), Income Tax Regs. The facts show here that the so-called escrow agreement entered into between the corporation, the Citizens National Bank, and Penn-Daniels was nothing more than a facade. At the settlement of the Phoenix property disposition to Penn-Daniels on August 9, 1991, the stipulated facts recite that the settlement funds were actually received by the corporation, and thereafter were transferred to the bank under the so-called escrow agreement. Further, there were no restrictions upon the right of the corporation, as transferor of the Phoenix property, to use the proceeds in any way which the corporation saw fit. The money was simply held by the bank for future disposition at the direction of the corporation. The only requirement was that the corporation designate the desired replacement properties in 45 days, and the bank was not required to hold the funds for the

account of the corporation beyond 180 days.  There was no obligation or requirement of any kind upon Penn-Daniels, as the transferee of the Phoenix properties; with the conclusion of the settlement of the transaction, as stipulated by the parties, Penn-Daniels was not required to do anything, was not called upon to do anything, and in fact did nothing.  It just took the Phoenix properties and went its way.  There were no effective restrictions nor escrow provisions of any kind with respect to the use of the funds by the corporation as transferor of the Phoenix properties nor by Penn-Daniels as the transferee.

We must therefore conclude that the overall transaction-- involving involving the transfer of the Phoenix property by the corporation to Penn-Daniels in August 1991, and thereafter the acquisition of the Coggeshall and Inness properties from parties other than Penn-Daniels--did not qualify as a tax-free exchange under the provisions of section 1031(a).  The acquisition of the latter two properties by the corporation did not take place until 1992; we conclude that the transfer of the Phoenix properties by the corporation to Penn-Daniels in August 1991 for cash was taxable under section 1001(c) for 1991 in the normal course, with gain or loss to be computed as provided in section 1001(a) and (b).

Decisions will be entered

under Rule 155.